UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ROY O. BALL and NORMAN W. BERNSTEIN, as Trustees on behalf of Environmental Conservation and Chemical Corporation Site Trust Fund,<br><br>        Plaintiffs,<br><br>    v.<br><br>VERSAR, INC.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>) Cause No. 1:01-cv-0531-DFH-TAB<br>)<br>)<br>)<br>)<br>) |

**TRUSTEES' MEMORANDUM OF LAW IN SUPPORT OF
MOTION IN LIMINE TO EXCLUDE TESTIMONY OF
VERSAR'S EXPERT WITNESSES**

Plaintiffs, Roy O. Ball and Norman W. Bernstein as Trustees ("Trustees") of the Environmental Conservation and Chemical Corporation Site Trust Fund ("ECC Trust"), submit the following memorandum of law in support of their motion to exclude the testimony of Mr. David R. Perry ("Mr. Perry") and Mr. Val F. Britton ("Mr. Britton"), who are expert witnesses proffered by Defendant, Versar, Inc. ("Versar").

## I.  INTRODUCTION

The opinions of Mr. Perry and Mr. Britton that Versar intends to offer are plainly calculated to attempt to give Versar an "out" under Amendment No. 2 to the Versar Contract. (*See generally* Trustees' Brief in Support of its Cross-Motion for Partial Summary Judgment at 39-45.)  However, as shown in detail by the Affidavit of Dr. Gabriel P. Sabadell dated March 2, 2006 submitted in support of Trustees' Motion to Exclude Testimony (hereafter "Sabadell Limine Aff.")[1], Mr. Perry relies for his thesis that there is dense non-aqueous phase liquid

---

[1] The Affidavit of Gabriel P. Sabadell in Support of Motion in Limine, dated March 2, 2006, and its appended exhibits in Support of Motion In Limine, are attached as Exhibit A.

("DNAPL") present somewhere at the Site below the contractual zone of influence on a patently incorrect measurement of the depth of the screen of well T-2 (and does so repeatedly even after the error was called to his attention).  Mr. Britton cites boring logs as to the construction of that monitoring well and several other monitoring wells in support of his thesis of a downward hydraulic connection even though the actual well construction logs (which he ignores) contradict his understanding as to which layer the wells are screened in.  And both Mr. Perry's and Mr. Britton's opinions are characterized by speculation, incorrect use of data, and unsupported assumptions. Both experts have also turned a blind eye to data that contradicts their theories, cherry-picking only the data that supports their position.  Their opinions thus do not meet the minimum standards for reliability set forth in the Federal Rules of Evidence, Rule 702 as interpreted by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L.Ed.2d 469, 113 S.Ct. 2786 (1993) and the subsequent *Daubert* decisions.

## II.  BACKGROUND

The Trustees entered into a fixed-price Contract with Versar to achieve the cleanup of the ECC Superfund site ("the Site").  Under the Contract, Versar agreed to design and to operate an SVE system to achieve <u>all</u> the cleanup standards set out in Table 3-1 of Revised Exhibit A to the Consent Decree entered by this Court.  The Contract assigned the risk of unknown Site conditions to Versar.

Versar's SVE system never achieved any of the Table 3-1 cleanup standards. The reason for that outcome became clear in the depositions of Versar's representatives.  Notwithstanding its representations to the Trustees and to EPA that the SVE system would clean up the Site, we now

know that Versar never intended or designed the SVE system to achieve the subsurface water standards contained in Table 3-1, a fact that was first disclosed in depositions in this lawsuit.

In an attempt to avoid liability for its undisputable failure to meet the Table 3-1 cleanup standards, Versar has focused much of its defense on Amendment No. 2 to the Contract, which it claims somehow should be read to excuse Versar from any liability in this action. Paragraph 2 of Amendment No. 2 provides:

> If Revised Exhibit A Table 3-1 cleanup standards cannot be achieved within twenty-four months by reason of soil contamination located below the ZOI [zone of influence] or by reason of Product, and Versar has complied with the actions set forth in Sections 5 through 8 of this Amendment plus such other reasonable Trustees' instructions with respect to addressing such below ZOI soil and Product, Versar will not be held by the Trustees to be in breach of its Contract by reason of its inability to do so.

As previously noted in the Trustees' briefing of the pending cross-motions for summary judgment, Versar did not follow the Trustees' instructions and the only Product[2] found at the Site was in compliance monitoring well T-2. There is no dispute that the small amount of Product in T-2 did not prevent Versar from achieving compliance. With EPA's permission, T-2 was converted into a treatment well, successfully cleaned up, and a replacement compliance monitoring well T-2A was installed. However, both monitoring wells T-3 and T-2A failed to achieve the required Table 3-1 cleanup levels. No Product was ever found in wells T-3 or T-2A, nor in any of the other monitoring wells that determined compliance (T-1 or T-4A). (Hutchens Aff. ¶¶ 6-9.)[3]

---

[2] Free product ("Product") is raw contaminant, a hundred percent concentration of a contaminant that is not dissolved into the soil or in the water. Gaffney Dep. at 77. Trustees' Additional Designation of Evidentiary Material in Response to Defendant's Motion for Summary Judgment and in Support of Trustees' Cross Motion for Summary Judgment, Ex. 41. (Docket No. 56.)

[3] Trustees' Additional Designation of Evidentiary Material in Response to Defendant's Motion for Summary Judgment and in Support of Trustees' Cross Motion for Summary Judgment, Ex. 40. (Docket No. 56.)

Versar's experts devote much of their testimony and reports to hypothesizing about the existence of Product somewhere else on the Site that they assert prevented Versar from achieving cleanup levels (even though as noted below Product has not been found elsewhere on the Site) and about supposed contamination below the contractual ZOI somehow recharging the ZOI (even though there is no data to support that contention and the ground water in the underlying sand and gravel layer is essentially clean).

Versar also tries to escape liability on the basis of Paragraph 3 of Amendment No. 2. Paragraph 3 provides:

> In the event that there is a direct hydraulic connection between sand lens in the till and the underlying aquifer in the sand, Versar shall have no responsibility therefore [sic].

(Amendment No. 2, ¶ 3.) In essence, Versar's legal position is that the mere existence of a hydraulic connection, even if Versar cannot show that its system would have achieved Table 3-1 cleanup standards but for the connection, relieves Versar from any obligation to achieve the cleanup standards which it agreed to meet both in its original Contract and again (knowing of the till water problem) in Amendment No. 2. For reasons discussed in the briefing on the pending Cross-Motions for Partial Summary Judgment, that is a complete misreading of Amendment No. 2.

However, Versar's experts also assert that the supposed hydraulic connection extended into the SVE contractual zone of influence, that this led to continuous recharge of water from the clean underlying sand and gravel layer, and that this, in turn, somehow impacted Versar's ability to achieve Table 3-1 cleanup levels. (Mr. Perry in effect posits that the connection is upward, Mr. Britton says the connection is downward, but neither can show that if it exists that it extends into the contractual zone of influence, and neither explains why no excess water was collected by the system even though the design clearly indicated it would if there were such a connection).

- 4 -

### III. ARGUMENT

#### A. The Sabadell Affidavit in Support of Motion in Limine

As noted by Dr. Sabadell in his Affidavit dated March 2, 2006 submitted in Support of Motion in Limine, both Mr. Perry and Mr. Britton assert that contamination "outside" (*i.e.*, below) the contractual ZOI supposedly had an adverse effect on Versar's ability to achieve the Table 3-1 cleanup standards. Sabadell Limine Aff. ¶2.  They primarily rely on the single incidence of a small amount of DNAPL detected in the bottom of former well T-2 and infer that the DNAPL must have entered well T-2 from below the contractual ZOI because, according to Mr. Perry, "the screened interval for this well begins at a depth <u>below</u> the contract required treatment zone" (Perry Report, November 4, 2004, p. 3, see p. 10 (emphasis added), Exhibit 4 to the Sabadell Limine Aff.)

However, as shown in Dr. Sabadell's December 3, 2004 Report, Exhibit 1 to the Sabadell Limine Aff., Mr. Perry in his November 2004 Report was simply incorrect as to the depth of the well screen - which in fact was screened as noted by Dr. Sabadell "at an elevation <u>above and below</u> the designated ZOI". (Sabadell Dec. 2004 Report, p. 3, Para. 5 and first bullet, Exhibit 1 to the Sabadell Limine Aff.)  The Sabadell December 2004 Report also discusses the correct elevations. <u>Id</u>.

Ignoring the point, Mr. Perry once again, this time in his December 28, 2005 Affidavit, based his opinion on the plainly incorrect assertion that "the screened interval for this well [T-2] <u>begins</u> at a depth <u>below</u> the contract required treatment zone". (Perry December 2005 Affd. at 3-4, Ex. 2 to the Sabadell Limine Aff.)  It does not.  The well screen plainly begins <u>above</u>, not below, the required treatment zone — the screen and filter pack overlaps the contractual ZOI in significant part as Dr. Sabadell noted a year earlier, in December 2004. (Mr. Perry's incorrect

basic premise stems from his inability to measure correctly the depth of the well screen. (Sabadell Aff. January 12, 2006, p. 2, Ex 3 to the Sabadell Limine Aff.; see Sabadell Limine Aff. ¶¶ 2-5.))

Mr. Perry's continued assertion that the T-2 well screen begins below the contractual ZOI in December 2005 after the error had been first brought to his attention in December 2004, a year earlier, shows that his testimony is not the product of reliable principles and methods reliably applied to the facts of this case. (Sabadell Limine Aff. ¶ 6.)

Mr. Perry also speculates that "it is highly likely that there are other, currently unidentified, areas with DNAPL present" and that these other "currently unidentified DNAPL sources, are preventing the SVE system installed by Versar from addressing the contamination". (Perry Report at 10, Exhibit 4 to the Sabadell Limine Aff.)  Mr. Perry seeks to explain this speculation by claiming in effect that it is justified "based upon the limited number of borings or wells" within the northern treatment area.  (*Id.*) Mr. Perry simply ignores that almost 56,580 square feet of exposed surface trench area, the equivalent to installing over 3,500 six-inch bore holes to a depth of 10 feet (in this small 2.5 acre northern treatment area) showed no DNAPL present. Additionally, as also shown in Dr. Sabadell's Affidavit, 26,500 cubic feet of subsurface material was removed during excavation of the SVE trenches in that same area, again with no indication of DNAPL present.  Speculation by Mr. Perry in the face of overwhelming adverse data is inconsistent with applying reliable principles and methods reliably to the fact the case. (Sabadell Limine Aff. ¶¶ 7-9.)

In an effort to support his speculation about the non-observed DNAPL being the source of Versar's problem, Mr. Perry resorts to an EPA guidance document that he says permits an inference that DNAPL is present if concentrations of DNAPL chemicals in groundwater exceed

a threshold level. What Mr. Perry omits is EPA's qualifier that the inference can be made "with more or less certainty <u>depending on the strength of the overall data.</u>" (Sabadell Limine Aff. ¶ 11, quoting *DNAPL Site Characterization*, EPA Publication No. 9355.4-16FS, Table 5 at p. 10 [emphasis added].) As noted above, here the overall data is overwhelmingly to the contrary.

Moreover, the data Mr. Perry relies upon to meet EPA's one percent threshold is not from monitoring wells, but only from FLUTe samples which are qualitative not quantitative in nature and cannot be appropriately used for this purpose. (Sabadell Limine Aff. ¶¶ 10-13.) Mr. Perry also ignores that all of the FLUTe data was collected within (not below) the contractual ZOI. (Sabadell Limine Aff. ¶ 13.) Mr. Britton (Versar's other expert), in his November 2004 Report, Exhibit 5 to the Sabadell Limine Aff., seeks to infer that contamination below the contractual ZOI had some effect on Versar's failure to meet the chemical specific Table 3-1 cleanup levels based on photoionization detector ("PID") measurements noted on drill logs. (Britton Report, at 9-10, Exhibit 5 to the Sabadell Limine Aff.) A PID, however, is an instrument used only for screening for the presence of contamination, it does not reflect the concentrations of any specific compound, and its results are unreliable as to the location of contamination in the saturated zone. (Sabadell Limine Aff. ¶ 14.)

To support their assertions that there is a hydraulic connection between the contractual ZOI and the underlying sand and gravel layer that somehow affected Versar's ability to achieve the Table 3-1 cleanup levels, Mr. Perry and Mr. Britton both rely on the observation that Site wells of different depths show similar ground water elevations. (Sabadell Limine Aff. ¶ 15, citing Perry Report at 14 and Britton Report at 8.) However, all of the wells Perry and Britton cite terminate beneath — not within — the SVE contractual treatment zone. (Sabadell Limine Aff. ¶ 16.) As Dr. Sabadell notes, a hydraulic connection will affect the groundwater elevations

in a well so long as any part of the well, even the bottom, intersects the zone in which the hydraulic connection is operative.  To show that a hydraulic connection reaches up into the contractual ZOI, Versar's experts must cite a similar elevation in a well that is located exclusively with contractual ZOI.  No such well exists.  The observed similarity in groundwater elevations is consistent, as Dr. Sabadell points out, with a hydraulic connection that extends only to the bottom of the shallowest till well and the bottom of the shallowest till well is below (not within) the contractual ZOI. (Sabadell Limine Aff. ¶ 16.)

Without any supporting data, Mr. Perry and Mr. Britton are simply speculating that a hydraulic connection with the underlying sand and gravel extends up into the contractual ZOI. (Id.) Moreover, Mr. Perry has admitted that the limited number of observation points as to the groundwater makes "it very difficult to 'trace' the interconnectivity" and that "it is very difficult to demonstrate a vertical hydraulic connection without a specially designed investigation."  Mr. Perry also admits that no such investigation has been designed or performed.  (Perry Report at 14, first and second bullets, Exhibit 4 to the Sabadell Limine Aff.; Sabadell Limine Aff. ¶ 17.)

Mr. Perry also postulates that there was a "continuous recontamination" of the contractual ZOI by groundwater moving up from the underlying sand and gravel aquifer. (See Perry Report, at 8-11, Exhibit 4 to the Sabadell Limine Aff; Perry December 2005 Aff. at 3-4, Exhibit 2 to the Sabadell Limine Aff.)  The problem is that there is no data to support the assertion that there is any significant contaminated groundwater below the contractual ZOI or that there is a direct hydraulic connection extending up into the contractual ZOI. As Dr. Sabadell notes, <u>both</u> would have to be true and neither assertion is supported by data. (Sabadell Limine Aff. ¶ 18.)

Indeed, to the extent there is data, it is completely inconsistent with that hypothesis. If there was a direct hydraulic connection, the SVE system would have produced water in excess of

the design criteria because the design criteria were predicated on their being no such connection and the amount of water actually collected was less (not more) than projected by the design. Mr. Perry simply ignores that rather basic point.  (Sabadell Limine Aff. ¶¶ 18-19; Sabadell Aff. of January 12, 2006, p. 4, Exhibit 3 to the Sabadell Limine Aff.)

Finally, Versar's other expert Mr. Britton, contrary to Mr. Perry, postulates a hydraulic connection with downward (not upward) potential. ("With the absence of artesian pressure in the upper 30 feet, a potential for <u>downward</u> vertical groundwater movement exists within this water-bearing zone, providing a transport mechanism for <u>downward</u> contaminant migration."  Britton Report at 8 (emphasis added), Ex. 5 to the Sabadell Limine Aff.)  Mr. Britton's opinion that artesian conditions are not present is based on the incorrect assertion that several wells including T-2 and T-2A are "screened in the 'sand and gravel.'"  (Britton Report at 8, Ex. 5 to the Sabadell Limine Aff.)  To show the construction of those wells Mr. Britton attaches as Appendix D to his Report the well <u>boring</u> logs, *i.e.*, the logs for the holes into which the wells are placed. (Britton Report, Appendix D, Ex 5 to Sabadell Limine Aff.) He simply ignores the well <u>construction</u> logs which show that, although the borings extended into the sand and gravel layer, the wells themselves and their screens did not.  The well construction logs (*see* Sabadell Limine Aff. Ex. 6) show, contrary to Mr. Britton's assertion, that the well screens for T-2 and T-2A (as well as the other on Site compliance wells) are screened entirely within the till and did <u>not</u> enter the sand and gravel layer.  (Sabadell Limine Aff. ¶¶ 20-22.)

Moreover, Mr. Britton's postulated downward gradient is inconsistent with the fact that although this Site was shut down more than twenty years ago, no significant contamination has ever been detected in the wells around the perimeter of the Site which were placed down gradient of groundwater movement in the sand and gravel layer specifically to detect contamination in the

- 9 -

sand and gravel layer moving off the Site. These wells should have shown contamination if, as postulated by Mr. Britton, there was a "transport mechanism for downward contaminant migration." (Britton Report at 8, Exhibit 5 to the Sabadell Limine Aff.)  Mr. Britton does not address the fact that those sand and gravel wells have never shown such contamination, which cannot be reconciled with his theory.   (Sabadell Limine Aff. ¶ 23.)

**B.     The Applicable Standard**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, <u>and</u> (3) the witness has applied the principles and methods reliably to the facts of the case.

(Emphasis added.)

In *Daubert*, 113 S.Ct. at 2786, the United States Supreme Court held that the Federal Rules of Evidence superseded the *Frye*[4] "general acceptance" test for the admission of expert opinion testimony.  The Court ruled that the Federal Rules of Evidence require district court judges to act as "gatekeepers" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 113 S.Ct. at 2795, 2798.   In *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 143 L.Ed.2d 238, 119 S.Ct. 1167 (1999), the Court extended its ruling to all expert testimony.  *Id.* at 1174.

"Reliability" means that the testimony must have "a grounding in the methods and procedures of science."  *Daubert*, 113 S.Ct. at 2795.  It must be more than subjective belief or unsupported speculation; it must be derived by the scientific method and supported by good

---

[4]*Frye v. United States,* 293 F. 1013, 1014 (D.C. App. 1923).

grounds.  *Id.*  The usual evidentiary requirement of first-hand knowledge is relaxed for expert witnesses on the assumption that her opinion has a reliable basis in the knowledge and experience of her discipline.  *Id.* at 2796.  Of course, the expert must also be properly qualified in the relevant field of expertise before opinion testimony will be allowed.  *Smith v. Ford Motor Company*, 215 F.3d 713, 718 (7th Cir. 2000).[5]  "Relevance" is defined by Fed. Rule Evid. 702, which requires that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue."  Expert testimony which does not relate to the issues, or has no valid scientific connection to the pertinent inquiry, does not assist the jury and is irrelevant and inadmissible.  *Daubert*, 113 S.Ct. at 2795.

Thus, this Court must determine whether Versar's experts are proposing to testify to scientific, technical or other specialized knowledge which will assist the jury to understand or determine an issue to be tried in this case.  *Id.* at 2796.  The Court must perform a preliminary assessment of whether their reasoning and underlying methodology is valid, and whether it can be applied to this case.  *Id.*[6]  The test is meant to be a flexible one.  Where the opinion of an expert is simply unsupportable, it is inadmissible:

> Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Target Market Publishing, Inc. v. Advo, Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998) (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 139 L.Ed.2d 508, 118 S.Ct. 512 (1997)). Over the last ten (10) years, the Seventh Circuit has discussed and applied the standards adopted by

---

[5] According to their resumes, neither of Versar's experts have any graduate degrees in any subject. (*See* Appendix A to Perry Report and Appendix A to Britton Report, Exhibits 4 and 5 to Sabadell Limine Aff., respectively.)

[6] *Daubert* also recited a non-exhaustive list of factors to assist in this determination, including (1) whether a theory or technique has been tested, (2) whether it has been subjected to peer review and publication, (3) the known or

*Daubert* and *Kumho Tire* many times and has not hesitated to exclude the speculative testimony of experts who do not meet *Daubert/Kumho* standards.[7]

Versar's experts have clearly tailored their testimony to the language used in Paragraphs 2 and 3 of Amendment No. 2 by which Versar seeks exoneration for its obvious breach. As this Court has noted: "Where a proffered expert's testimony rests on insufficient data and unreliable methodology, those [Rule 702] requirements are not met." *Owens v. Ford Motor Co.*, 297 F.Supp.2d 1099, 1110 (S.D. Ind. 2003).

The Seventh Circuit has repeatedly cautioned against allowing expert testimony based on speculation. See cases cited in note 7, infra. Testimony based on incorrect evidence has even less reliability and must be excluded. "A district court may exclude expert testimony where it finds that the testimony has no foundation or rests on obviously incorrect assumptions or speculative evidence." *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 681 (1st Cir. 1994). "The opinion of an expert who relies on inaccurate data does not have a sufficiently reliable basis to be admissible under *Daubert*." *Muzzey v. Kerr-McGee Chemical Corporation*, 921 F.Supp. 511, 519 (N.D. Ill. 1996); *see also Macaluso v. Herman Miller, Inc.*, 2005 WL 563169, at *8 (S.D.N.Y. 2005) (concluding that an expert's testimony must be excluded under Daubert "because it is based on incorrect factual assumptions"). Mr. Perry's incorrect measurement of the location of the T-2 screen and Mr. Britton's misunderstanding of

---

potential rate of error, and (4) the general acceptance of the theory in the relevant community of experts. *Id.* at 2796-2797.

[7] *See*, *e.g.*, *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (expert's opinion "nothing more than speculation."); *Chapman v. Maytag Corporation*, 297 F.3d 682 (7th Cir. 2002) (unreliable expert testimony improperly admitted; new trial warranted); *Target Market Publishing, Inc. v. ADVO, Inc.*,136 F.3d 1139 (7th Cir. 1998) (court correctly excluded business appraiser's report where conclusions as to lost profits were based on assumptions that did not support conclusions); *Kirstein v. Parks Corporation*, 159 F.3d 1065, 1067 (7th Cir. 1998), cert. denied 526 U.S. 1065, 143 L.Ed.2d 542, 119 S.Ct. 1456 (1999) (expert offered "only speculation"); *Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607 (7th Cir. 1993) (experts' testimony properly excluded; not derived from scientific method).

the construction of the monitoring wells (because he relied on boring logs instead of well construction logs) are exactly those kinds of incorrect factual premises.

Similarly, the use of PID readings or FLUTe data which are qualitative not quantitative, constitute the use of unreliable data. Where, as here, an expert relies on unreliable data to reach an opinion, the court may disregard that opinion. *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025-26 (10th Cir. 2002) (holding no abuse of discretion to exclude expert's testimony regarding product market where testimony was based on unreliable data).

Mr. Perry's admission that is very difficult to demonstrate a vertical connection without conducting a specially designed study — which of course he did not design let alone conduct — also renders his opinion on that subject simply speculation. *See In re Hanford Nuclear Reservation Litigation*, 894 F.Supp. 1436, 1448-49 (E.D. Wash. 1995) (excluding testimony from expert who conducted no independent tests to support his hypotheses on the grounds that "hunches" or "educated guesswork" cannot meet the *Daubert* requirements).

Additionally, as noted above, there is what the Seventh Circuit has described as an "analytical gap" between the observation of the similar groundwater elevations in monitoring wells on one hand, and Mr. Perry's and Mr. Britton's assertion of a hydraulic connection that extends upward past the base of the monitoring wells and into the contractual ZOI on the other. (Sabadell Limine Aff. ¶¶ 15-16.)  The Seventh Circuit has repeatedly held that such an "analytical gap" between the data and the expert's opinion renders an expert's testimony inadmissible.

> Another indicator of unreliability is the unjustifiable extrapolation from an accepted premise to an unfounded conclusion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 657-58 (7th Cir.1998) (holding that a "bare conclusion" offered without explanation or

> empirical support fails the reliability requirement of Rule 702); Fed.R.Evid. 702 advisory committee's note (2000 amends.) (listing "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion" as a relevant factor in determining reliability of expert testimony).

*Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 536 (7th Cir. 2005).

Finally, Mr. Perry and Mr. Britton have "cherry-picked" data to bolster their opinions and have failed to address data that is inconsistent with those opinions. The requirements of *Daubert* are violated when expert witnesses "cherry-pick" the facts that favor their theories and fail to explain why they have ignored other facts that undermine their theories.

> Under similar circumstances, the Seventh Circuit affirmed a district court's order barring an expert from testifying because the proffered expert did not adequately explain why he ignored certain facts and data while accepting others and failed to present any other data that supported his opinion. Essentially, the expert 'cherry-picked' the facts he considered to render his opinion, and such selective use of facts failed to satisfy the scientific method and *Daubert*.

*Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp.*, 2003 WL 1797844 at *1 (N.D. Ill. 2003) (citations omitted). "This Court rejects the plaintiffs' experts opinions inasmuch as they rely on selective data from epidemiological studies." *Caraker v. Sandoz Pharmaceuticals Corp.*, 172 F.Supp.2d 1046, 1049 (S.D. Ill. 2001). "As the defendants correctly observe, the problem with Dr. Welsh's analysis is that he is selective in his choice of supporting data, focusing only on those fragments of data which tend to lend credence to his theory." *In re Hanford Nuclear Reservation Litigation*, 894 F.Supp. 1436, 1450 (E.D. Wash. 1995).

## IV.  CONCLUSION

For all of the above reasons, Mr. Perry and Mr. Britton have not applied reliable principles and methods reliably to the facts of the case, their testimony can be of no assistance to a jury, and their testimony should be excluded both at trial and from consideration in any other aspect of this case.

Respectfully submitted,

_____
Alan H. Goldstein (#7190-49)
Curtis W. McCauley (#16456-49)

Attorneys for Plaintiffs, Roy O. Ball and
Norman W. Bernstein, as Trustees on behalf
of Environmental Conservation and
Chemical Corporation Site Trust Fund

ICE MILLER
One American Square Box 82001
Indianapolis, IN 46282-0002
317.236.2100

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 9th day of March 2006, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

| | |
|---|---|
| Philip L. Hinerman<br>FOX ROTHSCHILD, LP<br>phinerman@foxrothschild.com | David Haskett<br>LOCKE REYNOLDS, LLP<br>dhaskett@locke.com |
| Sharon Oras Morgan<br>FOX ROTHSCHILD, LP<br>smorgan@foxrothschild.com | Dean Brackenridge<br>LOCKE REYNOLDS, LLP<br>dbrackenridge@locke.com |
| Cory Stephen Brundage<br>cb@brundagelaw.com | Norman B. Berger<br>VARGA BERGER LEDSKY HAYES & CASEY<br>nberger@vblhc.com |

_____
Curtis W. McCauley

ICE MILLER
One American Square Box 82001
Indianapolis, IN 46282-0002
317.236.2100