UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ROY O. BALL and NORMAN W.        )
BERNSTEIN, As Trustees On Behalf Of  )
ENVIRONMENTAL CONSERVATION     )
AND CHEMICAL CORPORATION SITE   )
TRUST FUND,                           )
                                   )
     Plaintiffs,                )
                                   )
         v.                    )
                                   )
VERSAR, INC.,                  )
                                 )
     Defendant, Counterclaimant,   )  CASE NO. 1:01-cv-0531-DFH-TAB
     and Third Party Plaintiff,     )
                                   )
         v.                    )
                                 )
ENVIRONMENTAL RESOURCES      )
MANAGEMENT, INC. and          )
RADIAN INTERNATIONAL, LLC,    )
                                 )
     Third Party Defendants.     )
_____)
                                 )
ENVIRON INTERNATIONAL       )
CORPORATION,                 )
                                 )
     Intervenor.               )

ENTRY ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This case presents a contract dispute relating to the remediation of an EPA-

designated Superfund hazardous waste site in Boone County, Indiana.  Plaintiffs

Roy O. Ball and Norman W. Bernstein ("the Trustees") are trustees for the fund

formed by hazardous waste generators to clean up the site under an agreement

with federal and state government authorities.  The Trustees filed this action against defendant Versar, Inc. for breach of its contract to perform remediation services at the site.

The parties have filed essentially cross-motions for partial summary judgment.  The primary issues are whether Versar fulfilled its performance obligations under the contract and, if not, whether it was excused from doing so based on an "Additional Work" provision or a contract amendment.  As explained in detail below, each motion is granted in part and denied in part.  Under the express language of the contract, Versar bore almost all of the risk of uncertainties relating to hydrological and subsurface conditions at the site.  The undisputed evidence shows that Versar was obligated under the contract to achieve the clean-up standards mandated by the consent decree and that it failed to do so.  Versar's failure to perform was not excused by the exclusion of "Additional Work" from the scope of its responsibilities.  However, Versar has presented evidence that raises a genuine issue as to whether its failure to achieve required clean-up standards was caused (and thus excused) by soil contamination below the contractual "zone of influence" of its remedial system.  The parties agreed in their second amendment to the contract that that situation would excuse Versar's failure to achieve the agreed clean-up standards.  Versar has not raised a genuine issue that it is entitled to rescission or reformation of its contract based on a theory of either mutual mistake or unilateral mistake combined with inequitable conduct by the Trustees.  Because its written contract is enforceable, Versar's unjust

enrichment and implied contract claims fail as a matter of law. Versar is entitled to summary judgment in its favor, however, on the Trustees' claim for breach of the contract's forum selection clause.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must show there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The fact that both sides have filed cross-motions does not alter this standard; the court must consider each motion independently and will deny both motions if there is a genuine issue of material fact. *E.g.*, *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993); *Harms v. Laboratory Corp. of America*, 155 F. Supp. 2d 891, 905-06 (N.D. Ill. 2001).

A factual issue is material only if resolving the factual issue might change the suit's outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *Id.* "Where there are no genuine issues of material fact,

contract interpretation is particularly well-suited for summary judgment." *Allstate Ins. Co. v. Tozer*, 392 F.3d 950, 952 (7th Cir. 2004) (reversing and remanding with instructions to enter summary judgment in favor of plaintiff on issue of Indiana contract law).

*Facts For Summary Judgment*

From 1977 until 1982, the Environmental Conservation and Chemical Corporation ("Enviro-Chem") operated a facility in rural Boone County for processing and reclaiming solvents, oils, and other wastes from industrial clients. The accumulation and discharge of contaminated storm water, poor management of drum inventory, and several spills at the site ultimately led the United States Environmental Protection Agency ("EPA") and the State to investigate. In 1982, a court ordered Enviro-Chem to close and environmentally secure its site.

EPA listed the Enviro-Chem site as a Superfund hazardous waste site to be addressed by federal and state authorities and potentially responsible parties ("PRPs"). Throughout 1983 and 1984, EPA and a group of over 250 hazardous waste generator PRPs performed immediate removal and groundwater collection activities pursuant to a 1983 Consent Decree. In 1987, the EPA selected a longer-term remedy in a Record of Decision ("ROD"). The 1987 ROD called for the installation of a permanent cap over the site and a system to intercept and treat contaminated groundwater.

A steering committee for the Trustees later proposed an alternative remedial action plan involving soil vapor extraction rather than groundwater collection and treatment.  See Def. Ex. 9.  A soil vapor extraction ("SVE") system operates by using vacuum pumps to extract air from a network of wells and/or trenches located throughout a vapor extraction area.  The volatile contaminants essentially evaporate from the soil and the extracted vapors are then treated before being released into the atmosphere.  Free liquid in the air is collected in a separate container and pumped to an on-site storage tank for treatment and later release.  In 1991, EPA revised its ROD to use the SVE remedy in the northern area of the Enviro-Chem site.  See Def. Ex. 8 ("Revised ROD").[1]

Following EPA's approval of a site remedy, Judge Noland of this court entered a negotiated Consent Decree between EPA and the PRPs.  See Def. Ex. 6.  The Consent Decree required the PRPs to establish a trust, to raise and administer funds, and to manage implementation of the remedial action at the Enviro-Chem site.  Both the Revised ROD and the 1991 Consent Decree called for a contingent remedy in the event that the SVE system failed to clean up conditions at the site within five years.

---

[1]For purposes of this dispute, the court is concerned only with remediation activities at the Enviro-Chem site and not the adjacent Northside Sanitary Landfill, which was affiliated with Enviro-Chem and has its own long history of litigation.  Versar's SVE system was put to use on native till in the northern and central areas of the Enviro-Chem site and on materials that had been excavated and placed there from the southern concrete pad area.  "Till" refers to the shallow layer (approximately zero to thirty feet deep) of glacial sediments such as silt, clay, sand, and gravel.  See Def. Ex. 24 (Britton Report) at 6.

Plaintiffs Roy O. Ball and Norman W. Bernstein are trustees for the fund created by the 1991 Consent Decree. The Trustees sought bids for remediation services and eventually accepted the bid of defendant Versar, Inc. On August 28, 1997, the Trustees entered into a fixed-price contract with Versar ("the Contract") for, among other things, the design, construction, operation, and maintenance of an SVE system. See Def. Ex. 1. The Trustees previously had retained Radian International, LLC ("Radian"), through its predecessor company AWD Environmental Services ("AWD"), and Environmental Resources Management, Inc. ("ERM") to participate in the testing and investigation of environmental conditions at the Enviro-Chem site and the design of the remediation system.

Versar prepared two presentations for EPA concerning the design of the SVE system. See Pl. Exs. 14 & 15. In mid-November 1997, EPA approved the design and authorized Versar to proceed. Pl. Exs. 16 & 17. The SVE system became operational on November 24, 1998.

Versar and the Trustees eventually became involved in a dispute under the Contract. In an effort to resolve their dispute, they entered into an Amendment to Contract/Settlement Agreement and Release ("Amendment No. 1"), which became effective May 4, 1999. See Def. Ex. 2.

After the parties entered into Amendment No. 1, additional disputes arose. On June 2, 1999, George Anastos, Versar's Senior Vice President and Project

Manager, contacted the Trustees requesting additional compensation for consulting work at the site.  See Pl. Ex. 18.  Trustee Bernstein responded that Versar was obligated to achieve the clean-up standards without an adjustment in contract price and that recent monitoring well data did not appear consistent with reaching that goal within the two-year time period provided by the contract.  See Pl. Ex. 19.  Versar's General Counsel, James Dobbs, responded in turn:  "It is Versar's position that groundwater remediation, whether till water or saturated aquifer, is not within Versar's scope-of-work."  See Pl. Ex. 20.  Counsel for the Trustees wrote Dobbs, referring him to the mandatory claims procedure under the Contract.  See Pl. Ex. 21.  Trustee Ball wrote Anastos requesting that Versar develop a plan to augment its SVE system to deal with monitoring wells T-2 and T-6.  See Pl. Ex. 22.  On November 30, 1999, the parties reached a compromise and agreed to a second amendment to the Contract – Amendment No. 2, Settlement Agreement and Release ("Amendment No. 2").  See Def. Ex. 3.

Till water data from March 2000 and again in September 2000 showed that at least two of the on-site monitoring wells were not achieving the clean-up standards set forth in the 1991 Consent Decree.  Trustee Ball sent demand letters to Versar on September 21, 2000 and October 24, 2000, requesting that it concentrate or otherwise augment the SVE system to achieve clean-up standards by November 24, 2000.  See Pl. Exs. 23 & 24.

On November 22, 2000, pursuant to Article 14.2 of the Contract, the Trustees issued a written Notice of Default to Versar claiming that Versar was in default because it had not augmented the SVE system to achieve compliance with "all clean-up standards" "as rapidly as possible" and could not achieve compliance within the Contract's allowed time.  See Def. Ex. 16.  On January 4, 2001, the Trustees gave Versar written notice that it was terminating the Contract for convenience pursuant to Article 19.1.  See Def. Ex. 17.

In March 2001, Versar filed suit against Trustee Ball, ERM, URS Corporation (the successor company to AWD), and Environ International Corporation in the United States District Court for the Eastern District of Pennsylvania.  See Pl. Ex. 27.  Versar alleged that the defendants had withheld critical information from it about physical conditions at the Enviro-Chem site and had not paid adequate compensation for its services.  Versar eventually dropped its claims against Environ International.  The remaining defendants moved to dismiss Versar's suit on the basis of the Contract's forum selection clause pursuant to Federal Rules of Civil Procedure 12(b)(3) and 12(b)(6) or, in the alternative, to transfer it to this district under 28 U.S.C. § 1404(a).  Plaintiff Ball also moved to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.  In July 2001, the district court in Pennsylvania transferred the case here under § 1404. See Def. Ex. 27.

The Trustees filed this action in April 2001. They seek a declaratory judgment that Versar is obligated under the Contract and its amendments to achieve all Revised Exhibit A clean-up criteria, including the subsurface water criteria as measured in the on-site till wells (Count V). They contend that Versar's failure to achieve compliance constitutes a breach of the Contract (Count I) and a breach of its express warranty (Count IV). The Trustees also allege that Versar breached the Contract's forum selection clause by originally filing suit against Trustee Ball in the district court in Pennsylvania (Count II).[2]

Versar alleges that the Trustees improperly retained amounts owed to it under the Contract and accepted services outside the scope of the Contract without payment. Versar has brought counterclaims for breach of contract (Count I) and alternative counterclaims for unjust enrichment (Count II) and implied contract (Count III).[3]

The court previously has resolved a motion to dismiss and a motion for partial summary judgment by the Trustees. The court granted the Trustees' motion to dismiss Versar's counterclaims for negligent misrepresentation and

---

[2]Count III of the Trustees' First Amended Complaint alleges that Versar breached the Contract by filing suit in violation of its covenant not to sue and release of all claims that were part of both amendments to the Contract. Neither side has moved for summary judgment on Count III.

[3]In its briefing, Versar cites to its Second Amended Answer and Counterclaim that was filed on November 18, 2002. See Def. Ex. 5. After filing its motion for partial summary judgment, Versar filed a Third Amended Answer and Counterclaim on September 1, 2005. See Docket No. 267 (JAMS). The court references the more recent pleading in this entry.

breach of a duty of good faith and fair dealing, but denied the motion to dismiss Versar's unjust enrichment counterclaim.  The court granted the Trustees' motion for partial summary judgment on any claims by Versar predating the effective date of Amendment No. 1 and Amendment No. 2, with the exception of a counterclaim for fraud based on alleged affirmative misrepresentations.  Versar later withdrew the fraud claim.

*Discussion*

The case now comes before the court on the parties' cross-motions for partial summary judgment.  Versar has moved for summary judgment on Counts I, II, IV, and V of the Trustees' First Amended Complaint.  See Docket No. 247 (JAMS).[4]  Versar argues that it has satisfied its obligations under the Contract and that the "Additional Work" provision and Amendment No. 2 excuse any further performance.  Alternatively, Versar argues that the Contract is unenforceable because its performance was premised on mutually mistaken assumptions about the type and extent of contamination, and because the Trustees engaged in inequitable conduct that prevented those assumptions from being corrected. Versar also argues that filing suit in the Eastern District of Pennsylvania did not breach the Contract's forum selection clause.

---

[4]Citation to "JAMS" docket numbers refers to the docket system used by the court prior to implementation of the electronic case filing system.

The Trustees have moved for partial summary judgment to dismiss Counts II and III in Versar's Third Amended Answer and Counterclaim and for partial summary judgment in their favor as to liability only on Counts I, II, and IV of their First Amended Complaint.  See Docket No. 4.  The Trustees' motion is essentially a cross-motion to Versar's motion:  the Trustees argue that Versar breached the Contract and its express warranty by failing to achieve required clean-up standards at the Enviro-Chem Site.  The Trustees contend that Amendment No. 2 did not eliminate any of Versar's obligations and that Versar has waived any argument relating to that amendment by failing to invoke the mandatory claims procedure specified in the Contract.  The Trustees also argue that the existence of an express written contract and the release in Amendment No. 1 require dismissal of Versar's unjust enrichment and implied contract claims.

I.      *Trustees' Claim for Breach of Contract*

The parties agree that Indiana law governs their claims, as the Contract itself expressly provides.  The Trustees argue that the undisputed evidence shows that Versar breached the Contract by failing to achieve the clean-up standards set forth in Table 3-1 to Revised Exhibit A to the 1991 Consent Decree.

A.      *Versar's Performance*

Versar's work under the Contract was described generally as "conducting the Revised Remedial Action (RRA) at the Enviro-Chem Superfund Site . . . in

accordance with the Consent Decree including Revised Exhibit A to the Decree, and achieving the Remedial Action Clean-Up Standards specified in Revised Exhibit A." Art. 1.1. The Contract explicitly incorporated as contract documents the "Consent Decree including Revised Exhibit A . . . and all of Revised Exhibit A's Tables, Figures, and Appendices." See Art. 20.1.7.

Revised Exhibit A is the main technical appendix to the 1991 Consent Decree. See Def. Ex. 11. Section 3.1 of Revised Exhibit A provides:

> The following Clean-up Standards will be met for successful completion of the SVE program:
>
> Acceptable Soil Concentrations shown in Table 3-1 will be achieved according to the procedure discussed in Section 4.2.3 of Exhibit A.
>
>        * * *
>
> Acceptable Subsurface Water Concentrations as shown in Table 3-1 (or Applicable Subsurface Water Background Concentrations) in the on-site till wells will be achieved according to the procedures described in Section 4.2.2 of Exhibit A
>
>        * * *

Table 3-1 of Revised Exhibit A lists specific chemical limits that represent acceptable soil and subsurface water contaminant concentrations.[5]

---

[5] Section 3.1 also required that "Acceptable Stream Concentrations" and/or "Surface Water Background Concentrations" be demonstrated for samples collected from the stream adjacent to the Enviro-Chem site and from off-site wells. Compliance with those standards is not at issue here.

The Consent Decree required the presence of on-site till monitoring wells in the SVE area to measure contaminant concentrations in the subsurface water in contact with the soils.   Samples from these wells were to be analyzed in accordance with the Acceptable Subsurface Water Concentrations in Table 3-1. Versar was not responsible under the Contract for installing monitoring wells or for sampling the wells, the soil, or the surface water.  See Art. 1.2.  Nevertheless, Section 4.2 of Revised Exhibit A explained how data from the well and soil samples would be used to measure achievement of soil clean-up standards:

> Verification of soil cleanup will be established when each of the following is met:  (1) the soil vapor from the restart spike tests shows compliance with the calculated soil vapor concentrations in equilibrium with Acceptable Soil Concentrations for the VOCs listed in Table 3-1 . . . ("Soil Vapor Criterion"), (2) on-site till wells show compliance with the Acceptable Subsurface Water Concentrations as shown in Table 3-1 . . . ("On-Site Till Water Criterion"), and (3) soil samples show compliance with the Acceptable Soil Concentrations . . . ("Soil Sample Criterion").

Section 4.2.3 specified:  "Once the Soil Vapor Criterion and On-Site Till Water Criterion for Soil Clean-up Verification have been demonstrated, . . . 20 soil samples . . . will be collected."  According to Revised Exhibit A, then, soil samples would be collected only after both the Soil Vapor Criterion and the On-Site Till Water Criterion had been achieved.  The Revised ROD indicated the same:  "The Acceptable Subsurface Water Concentrations specified in Attachment 1 will have to be met in the on-site till wells as part of the post soil cleanup verification required to shut off the soil vapor extraction system.  In addition, these cleanup levels form the basis for the Acceptable Soil Concentrations."  Def. Ex. 8 at 5.

Versar had broad responsibility under the Contract for "Designing the soil vapor extraction (SVE) system to achieve full compliance with the clean-up standards at the Site set forth in Revised Exhibit A," "assisting in obtaining approval of the SVE system design," "construction and the installation of the SVE system," and "O/M [operation and maintenance] of the SVE system itself to achieve compliance with the clean-up standards in accordance with Revised Exhibit A." See Art. 1.1. Versar's operation responsibilities extended to "augmentation of the system with additional wells or trenches . . . as may be necessary to achieve compliance in the most efficient manner." Art. 1.1.3. The Contract stated that the SVE system was to be designed, installed, and operated to achieve compliance with clean-up standards "as rapidly as possible" and in no event longer than twenty-four months after start-up of the SVE system. Art. 3.1.1.

The undisputed evidence shows that Versar breached the Contract by failing to design a SVE system capable of achieving, and by failing to achieve, the clean-up standards set forth in Revised Exhibit A to the 1991 Consent Decree. Charles Gaffney, Versar's Design Chief for the project, testified that Versar did not design its SVE system to meet the subsurface water concentrations in Table 3-1. See Gaffney Dep. at 50, 74-76; see also Anastos Dep. at 102-04. Versar has offered no evidence to dispute this point. Versar did achieve soil vapor standards as measured by the restart spike tests, but it failed to achieve compliance with acceptable subsurface water concentrations in two of the on-site till wells (T-2A

and T-3).  See Pl. Exs. 6 & 7 (Environ monitoring reports for First Quarter and Third Quarter 2001).

Versar has not offered any evidence to create a genuine issue that its SVE system achieved all of the required clean-up standards.  Initially, Versar argued that meeting the soil vapor equivalency standards amounted to successful remediation of the soils at the Enviro-Chem site.  The Trustees point out that although the soil vapor equivalency standards specified in Table 4-1 are calculated to be equivalent to the Table 3-1 soil clean-up values, determining whether the soils meet Table 3-1 standards requires actual soils tests, as provided in Section 4.2.3 of Revised Exhibit A.  Versar's argument overlooks the explicit requirement that it achieve compliance with "all" clean-up standards listed in Table 3-1 of Revised Exhibit A, as specified in the Contract, Revised Exhibit A itself, and the Radian 100% Design to which Versar bid.  See Pl. Ex. 3, Section 3.12.  This requirement also was specified in Versar's own 100% SVE design, dated November 14, 1997.  See Pl. Ex. 4.  Finally, Versar recommitted to this obligation in Amendment No. 2 to the Contract:   "Versar will conduct operation and maintenance 'O/M' as required by the Contract, including the augmentation of the soil vapor extraction ('SVE') system with additional wells or trenches as needed to achieve compliance with *all* Table 3-1 standards . . . ." (emphasis added).

B.     *Excuse of Versar's Performance*:  *"Additional Work" Provision*

Versar argues that the work needed to achieve the Table 3-1 clean-up standards is excluded from the scope of its responsibilities under Article 1.2 of the Contract.  Article 1.2 reads:

> Excluded Monitoring, Sampling, and Additional Work – Not included in the Work to be done by the contractor under this Contract are . . . (v) the "Additional Work" (if any) provided for under Section VII of the Consent Decree and Article 3.3 of Revised Exhibit A.

As noted earlier, both the Revised ROD and the 1991 Consent Decree provided for a contingent remedy involving a subsurface ground water collection and treatment system if clean-up objectives at the site were not met within five years.  In Section VII of the Consent Decree, the settling PRPs specifically agreed to implement the contingent remedy outlined in Section 3.3 of Revised Exhibit A.  See Def. Ex. 6 at 18.  In turn, Section 3.3 of Revised Exhibit A stated that if additional work was required under Section VII, the PRPs were required, among other things, to construct a subsurface water interception trench around the south and east sides of the site and to collect and transport the water intercepted in this trench for treatment.  This process was to be carried out until water samples demonstrated that acceptable stream or surface water background concentrations had been met.  See Def. Ex. 11 at 16-17.

Versar argues that the remedial plan the Trustees now propose as a remedy for Versar's failure to achieve the clean-up standards falls within the "Additional

Work" provisions of the Consent Decree and Revised Exhibit A and therefore is excluded from the scope of Versar's work under Article 1.2.  By way of background, in April 2005, Environ submitted to EPA on behalf of the Trustees a design for a revised remedy as an "Attachment Z-1" to the Consent Decree.  That design called for additional SVE trenches, a thin barrier curtain wall to prevent water from flowing between the trenches and a nearby creek, and a reactive gate to treat discharges from the trenches.  While Versar's SVE trenches operated to remediate the site, the SVE trenches in the Z-1 system are designed merely to keep contamination from leaving the site.  EPA indicated that the Z-1 design was acceptable, subject to technical conditions on June 3, 2005 and finally on July 8, 2005.  Hutchens Aff. Exs. 2 & 3.[6]

Environ then started work on the detailed design of the Z-1 remedy.  It became concerned, however, that two of the SVE trenches in another area might be too wet for vapor extraction, and it determined that a pump test was necessary

---

[6]Versar alleges that two weeks prior to the filing of its surreply, and pursuant to the Magistrate Judge's order mandating e-mail discovery and granting Versar's Fifth Motion to Compel Production of Documents, the Trustees provided it with 407 additional pages of documents.  According to Versar, approximately one week later, the Trustees forwarded an additional 551 documents to Versar's counsel, including letters dating back to December 2003.  See Versar Surreply Br. at 1-2.

As a result of what Versar describes as the Trustees' "selective, staggering of document production throughout the summary judgment process," Versar requests that the court disregard all references and materials set forth in the Trustees' exhibits to their reply brief.  The court denies Versar's request.  Versar has withdrawn its claim that the Trustees failed to produce the October 26, 2005 EPA letter, and Versar has identified specifically only one item that it claims was not produced but was cited by the Trustees in their reply brief (Pl. Ex. 44).  The court disregards that exhibit.

to resolve that issue.  Hutchens Aff. ¶ 19.  Environ proposed that installation of the curtain wall be accelerated so that the pump test could be performed.  The Trustees submitted a Revised Attachment Z-1 reflecting this change.  Hutchens Aff. ¶ 23, Ex. 5.  On October 26, 2005, EPA agreed to allow installation of the curtain wall and to delay finalization of the detailed Z-1 design until after the pump test had been completed.  Hutchens Aff. ¶ 27.

While the Trustees concede that the Revised Attachment Z-1 remedy is being carried out pursuant to the Additional Work provisions of the Consent Decree, they argue that the remedy is "significantly different" from the subsurface ground water collection and treatment system specified in Section 3.3 of Revised Exhibit A and therefore does not qualify as "Additional Work" under Article 1.2 of Versar's Contract.  Ronald Hutchens, the Managing Principal of Environ, testified that Section 3.3 calls for a passive leachate collection trench outside of the site that would need to be operated for 30 years or more, while Attachment Z-1 calls for SVE trenches and operation of the SVE system for about six months to one year.  He also testified to a significant difference in the costs of the remedies.  See Hutchens Aff. ¶¶ 13-14.

The Trustees argue that the Z-1 remedy is merely an "augmentation" of the SVE system for which Versar is responsible under the Contract.   Revised Attachment Z-1 states: "The existing SVE system will be augmented by additional trenches and the new trenches will be connected to the existing SVE system and

will be operated using the nine basic operations of the existing SVE system." Def. Ex. 19, Section 2.2. The Trustees claim that the Z-1 remedy uses the blowers, valves, and treatment systems of the existing SVE system.

Versar, on the other hand, argues that the Z-1 remedy does not use its SVE trenches and that the only remedial item currently approved by EPA under Attachment Z-1 is a thin barrier curtain wall that was not part of the SVE design to which it bid. Versar also cites several items of correspondence between the Trustees and EPA that reference "Additional Work" in the context of discussing the Z-1 remedy. See Def. Opp. Ex. 8 at 1 (September 2005 proposed revisions to Attachment Z-1 from Environ to EPA, stating that the "work required under Attachment Z-1 enhances and replaces the water interception trench originally required as the Additional Work in Revised Exhibit A and all Attachment Z-1 work will be conducted under the Additional Work provisions of the Consent Decree, as amended"); Def. Opp. Ex. 9 (October 26, 2005 letter from EPA to Trustees stating that the thin barrier curtain wall would replace the membrane provided for in Revised Exhibit A and that the parties anticipated that this agreed modification will be followed by additional, more significant revisions to other elements of the Additional Work that would add an active treatment element to the original Additional Work provisions); Def. Opp. Ex. 21 (October 25, 2004 e-mail from Environ to Trustee Ball incorporating EPA comments that "augmented SVE system" be removed and replaced with "Revised Additional Work" in several places in Revised Attachment Z-1). Finally, Versar highlights the fact that EPA is

requiring an Explanation of Significant Differences ("ESD") for the Z-1 remedy. See Def. Opp. Ex. 9.  Versar argues that this demonstrates that the remedy is not merely an augmentation of its SVE system but a completely different remedy for which it has no responsibility under Article 1.2.[7]

The court need not decide whether the Attachment Z-1 remedy is more properly characterized as "Additional Work" within the scope of Article 1.2 or as "Work" for which Versar could be responsible under Article 1.1.  As a matter of law, Article 1.2 does not relieve Versar from liability for failing to achieve the Revised Exhibit A clean-up standards.

Article 1.2 limits the scope of Versar's work, but it does not limit its liability for breach of the Contract.  Versar specifically committed to achieving the clean-up standards set forth in Table 3-1.  Simply because the Trustees are now

_____

[7]On July 7, 2006, the Trustees moved to supplement the record to include the proposed ESD itself, issued by EPA on or about June 26, 2006.  See Docket No. 98.  The Trustees argue that the document clearly distinguishes between the Z-1 remedy and the Additional Work described in Revised Exhibit A.  The Trustees also claim that the ESD is relevant to issues relating to Versar's liability following Amendment No. 2.

The Magistrate Judge granted the Trustees' motion to supplement the record.  Versar requested reconsideration of that ruling, arguing that consideration of the proposed ESD was premature and that the Trustees' arguments on issues related to the pending summary judgment motions should be stricken.  The Magistrate Judge denied Versar's motion but granted it leave to file a response.  In its response, Versar challenges each of the Trustees' specific points.

The parties have repeated essentially the same arguments here as in their original briefing of the summary judgment motions.  The court sees no need to discuss the significance of the proposed ESD in further detail.

pursuing a means of doing so that may fall outside the scope of Versar's work does not mean that Versar has no liability for its breach.  The Trustees have not demanded that Versar implement the Attachment Z-1 remedy, but rather that it pay the consequential damages of its breach.

The "Additional Work" provisions in the Consent Decree and Revised Exhibit A protected EPA's interests in the event that the Trustees' SVE remedy failed to clean up the Enviro-Chem site as required by federal law.  The "Additional Work" provision in Article 1.2 of Versar's contract, on the other hand, operated only to limit the scope of Versar's required work.  Article 1.2 does not negate or create an ambiguity regarding the plain language of the Contract holding Versar responsible for achieving the clean-up goals.  Article 1.2 does not raise a genuine issue as to Versar's breach.

C.     *Excuse of Versar's Performance:  Amendment No. 2*

Versar also argues that its performance is excused pursuant to Amendment No. 2 to the Contract because of the presence of certain site conditions.  Sections 1 through 3 of Amendment No. 2 state:

> 1.     Versar will conduct operation and maintenance "O/M" as required by the Contract, including the augmentation of the soil vapor extraction ("SVE") system with additional wells or trenches as needed to achieve compliance with all Table 3-1 cleanup standards as rapidly as possible and in no event longer than twenty-four months from November 24, 1998 without increase in Contract time or Contract price, except that if achieving compliance with all Revised Exhibit A Table 3-1 cleanup standards either requires addressing free product in the till ("Product") or soil contamination

below the Zone of Influence ("ZOI") of its existing SVE system as shown in attached Figure 1, Versar will receive an equitable adjustment equal to its own out of pocket costs to address Product or soil below the ZOI. Versar remains responsible, however, for dealing with all water (except as provided in Section 3. below) that the SVE system collects from the soil without any increase in Contract time or Contract price.

2.      If Revised Exhibit A Table 3-1 cleanup standards cannot be achieved within twenty-four months by reason of soil contamination located below the ZOI or by reason of Product, and Versar has complied with the actions set forth in Sections 5 through 8 of this Amendment plus such other reasonable Trustees' instructions with respect to addressing such below ZOI soil and Product, Versar will not be held by the Trustees to be in breach of its Contract by reason of its inability to do so.

3.      In the event that there is a direct hydraulic connection between sand lens in the till and the underlying aquifer in the sand, Versar shall have no responsibility therefore.

"Free product" refers to the pure chemical or oil substance as opposed to mere residual contamination in soil or water. See Bernstein Dep. at 125; Gaffney Dep. at 77. The ZOI in Figure 1 to Amendmenthi p No. 2 extends 13 to 15 feet below ground surface.

1.      *Waiver*

The Trustees first contend that Versar has waived any arguments relating to Amendment No. 2 by not invoking the mandatory claims procedure set forth in Article 9 of the Contract. That provision required Versar to issue written notice to the Trustees within three days if it considered any action or inaction by them to be a breach of contract or a constructive change that entitled Versar to some sort of relief from its obligations under the Contract, such as damages, an adjustment in contract price, or an extension of contract time. Failure to provide

such notice constitutes an "irrevocable waiver" of the claim by Versar.  See Art. 9.5.

The court agrees with Versar that the mandatory claims procedure does not apply to the arguments it raises here.  Versar has not alleged that some act or failure to act by the Trustees during the contract term entitles it to relief.  Instead, Versar argues that the presence of certain site conditions, in combination with the specific terms of Amendment No. 2, relieve it of liability for failure to achieve the agreed clean-up standards.  Also, Versar has not alleged that any actions by the Trustees amounted to a constructive change of the Contract.  Trustee Ball's letters in September and October 2000 put Versar on notice that the monitoring wells were not meeting clean-up standards, but the Trustees do not contend that they constituted an attempt to alter Versar's obligations under the Contract.  *E.g.*, *Northrop Corp. v. General Motors Corp.*, 807 N.E.2d 70, 90 (Ind. App. 2004) (for contractor to succeed on claim for change in scope of work, it must show "that the alleged change is actually a change of the terms of the contract and not merely a direction that a given product fails to satisfy the requirement set forth in the performance specifications").  The letters themselves do not mention Amendment No. 2 or its conditions, and no reasonable jury could conclude that they constructively changed Versar's obligations under the Contract by eliminating its ability to resort to the amendment.

2.      *Section One of Amendment No. 2*

Turning to the merits of Versar's arguments, Versar first contends that Section 1 of Amendment No. 2 excuses it from *all* responsibility under the Contract if it encounters free product in the till or soil contamination below the system's ZOI.   That is clearly not the case.   By its plain language, Section 1 permits Versar to recover its out-of-pocket costs in addressing those conditions but it does not relieve Versar of its underlying obligations to meet the Table 3-1 clean-up standards.

3.      *Section Two of Amendment No. 2*

Section 2, on the other hand, will not relieve Versar of its liability for breach of contract if it was unable to achieve clean-up standards within 24 months "by reason of" contamination below the ZOI or free product, so long as Versar complied with the actions set forth in the other parts of the Amendment and with the reasonable instructions of the Trustees.   In addition, Sections 1 and 3 involve a contingency based on a "direct hydraulic connection" between "sand lens in the till" and the "underlying aquifer in the sand."

The parties sharply dispute whether any of these subsurface conditions are in fact present at the site.   As discussed below, the court assumes for purposes of summary judgment that all three of the conditions existed, but Amendment No. 2 requires Versar to show more.   Amendment No. 2 was drafted carefully by two

sophisticated and well-counseled parties.  Those parties had already confronted difficult and serious disputes under the Contract.  The drafted Amendment No. 2 to allocate certain risks of particular types of failures caused by specified uncertainties.  To avoid liability, Versar must demonstrate not only that the subsurface conditions existed but that the other conditions of Amendment No. 2 were also satisfied.

First, with respect to Section 2, Versar was relieved from liability for breach of contract only if it was unable to achieve clean-up standards within 24 months "by reason of" contamination below the ZOI or free product.  The Trustees have identified *dissolved* phase contamination in wells T-2A and T-3 as the measure of Versar's failure to meet subsurface water clean-up standards.  Versar has not offered any evidence indicating that free product was ever found in these wells, or in any of the other monitoring wells that determined compliance (T-1 or T-4A). The Trustees contend, and Versar does not dispute, that the only free product ever encountered in operating the SVE system was found in the T-2 monitoring well in May 1999.  T-2 was converted into a treatment well and successfully cleaned up, and replacement well T-2A was installed.  Versar was paid separately for its work at T-2 in Amendment No. 2, Sections 4 through 6.  See Hutchens Aff. ¶¶ 4-10. Accordingly, regardless of whether there is reliable evidence demonstrating the possible presence of free product in other areas of the Enviro-Chem site, Versar has not presented evidence from which a reasonable jury could conclude that its

failure to achieve clean-up standards in T-2A and T-3 was "by reason" of free product, the specific contingency covered by Section 2.

On the other hand, the mechanism of causation relating to possible contamination below the ZOI is less clear. Versar has identified David R. Perry, a geologist, and Val F. Britton, a hydrogeologist, to testify as expert witnesses on these issues. Both experts have opined that contamination below the ZOI caused the SVE system to fail to achieve required clean-up standards. Perry testified that the Enviro-Chem site is more properly characterized as a glacial outwash deposit, as opposed to a glacial till, and that it has "numerous, interconnected zones of coarse-grained material that allow both vertical and horizontal migration of fluids." See Def. Ex. 25 (June 29, 2005 affidavit). He contends that contaminated soil below the ZOI is demonstrated by the presence of dense non-aqueous phase liquid ("DNAPL") in the T-2 well and by highly elevated photoionization detector ("PID") readings near that well. Perry hypothesizes that observed "sand seams" below the ZOI and near the T-2 well are interconnected and the source of DNAPL migration there. See Def. Motion in Limine Response Ex. B (Apr. 28, 2006 affidavit). Based on his review of site investigation reports and his experience at sites with similar glacially deposited sediments, Perry opines that contamination below the ZOI is continuously contaminating the soils within the ZOI.[8]

---

[8]Both parties have used the term "DNAPL" almost interchangeably with the notion of "free product," but neither has provided a good explanation of how the two are related. Versar stated recently only that "DNAPL is one way to provide information on free product." Dr. Sabadell testified that "free product" refers to "free phase DNAPL" as opposed to "residual DNAPL, which is immobile."

Britton agrees that a more accurate characterization of hydrogeologic conditions at the Enviro-Chem site would have identified the potential for vertical and horizontal migration of contaminants. See Def. Ex. 24 at 4-5 (Nov. 5, 2004 initial expert report). He opines that the sand and gravel layers at the site are stratified and poorly sorted, and he has created a graphical representation of the site based on drilling logs, site plans, and other measurements. He also contends that the presence of DNAPL in the bottom of the T-2 well demonstrates the existence of contamination below the ZOI. *Id.* at 9. Relying on PID measurements during the drilling of T-2, Britton claims that the DNAPL in T-2 was caused by the vertical migration of contaminants from the surface and the horizontal migration through sand seams in the sand and gravel layer. He testified that the most permeable portion of the T-2 well screen is between 17 and 19 feet below ground surface, indicating that the sand seams near the bottom of the well were the preferential pathways for contamination.

The Trustees have filed a motion *in limine* to exclude the testimony of Perry and Britton, arguing that their opinions do not satisfy the reliability requirements of Rule 702 of the Federal Rules of Evidence, and as articulated earlier by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). See Docket No. 79. Through the expert testimony of Dr. Gabriel Sabadell, a hydrologist, the Trustees argue that Versar's experts have relied on incorrect factual premises, have used qualitative data as if it provided quantitative information, and have "cherry-picked" data that supports their conclusions while

not addressing data that is inconsistent with those conclusions.  See Pl. Motion

in Limine Ex. A (Mar. 2, 2006 affidavit); Pl. Motion in Limine Ex. 3 (Jan. 12, 2006

affidavit).[9]

---

[9]In response to Dr. Sabadell's criticisms, Versar has moved to strike his January 12, 2006 affidavit (and all references to it) as containing expert opinions not previously included in reports submitted before the January 15, 2005 expert discovery deadline.  Versar points out that in his original deposition on December 30, 2004, Dr. Sabadell testified that he had no opinion as to whether or not there was a direct hydraulic connection at the site.  See Def. Ex. 26 at 239.  Versar argues that the Trustees' reliance on Dr. Sabadell's affidavit in support of its motion *in limine* violates Federal Rules of Civil Procedure 26 and 37(c)(1).

Versar's motion to strike is denied.  In the absence of a controlling order, Rule 26(a)(2)(C) permits a party to file an affidavit to contradict or rebut the arguments or opinions of other experts, provided that it is submitted within thirty days after the other party's disclosure.  Dr. Sabadell's January 12, 2006 affidavit was timely filed in response to Perry's December 28, 2005 affidavit, and its scope is clearly limited to rebutting Perry's supplemental testimony about hydrogeological conditions at the site.  Perry had not previously disclosed the specific bases for some of his opinions (*e.g.*, linking FLUTe data to DNAPL, linking the SVE system's inability to dewater the till unit to the presence of a hydraulic connection).  The Trustees were entitled to respond to his theories through Dr. Sabadell's testimony.

Moreover, even if Dr. Sabadell's January 12, 2006 affidavit had offered "new" opinions on relevant issues, any violation of Rule 26 would be harmless. The cases cited by Versar requiring exclusion of untimely expert testimony are readily distinguishable from these circumstances.  *E.g.*, *Salgado v. General Motors Corp.*, 150 F.3d 735, 741 (7th Cir. 1998) (affirming district court's decision to exclude untimely *and* incomplete expert reports after counsel already had received two extensions to complete discovery); *Miksis v. Howard*, 106 F.3d 754, 760 (7th Cir. 1997) (affirming exclusion of expert testimony where identity of witnesses and summary of their opinions were disclosed only three days before trial); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996) (affirming exclusion of rebuttal expert evidence disclosed only a few days before trial).  Dr. Sabadell's affidavit was originally submitted by the Trustees as part of their summary judgment briefing.  Versar did not raise any objection at that time, despite the case management order's requirement that "[a]ny party who wishes to preclude expert testimony at the summary judgment stage shall file any such objections with their response brief within the briefing schedule established by Local Rule 56.1."  Case Management Order ¶ (f) (Aug. 18, 2004).  Neither party has treated the court's scheduling order as precluding the submission of supplemental expert

(continued...)

-28-

Rule 702 imposes five requirements on proffered expert testimony:  (1) the witness must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the offered testimony or opinion must be based upon sufficient facts or data; (3) the offered testimony or opinion must be derived from reliable principles and methods; (4) the expert witness must have applied the principles and methods reliably to the facts of the case; and (5) the expert or specialized knowledge must be helpful in assisting the trier of fact to understand the evidence or to determine a fact in issue.  *E.g.*, *Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1105 (S.D. Ind. 2003).   Under Rule 702, trial courts must assume a "gatekeeping" role to ensure that the opinions presented to the jury are relevant, based on an adequate factual foundation, and the product of reliable methodology. *Id.*; see also *Daubert*, 509 U.S. at 597; *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006).   The court's role, however, is not to decide whether the expert's ultimate conclusion is correct:  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987).

Dr. Sabadell criticizes the reliability of several aspects of Versar's expert testimony.  First, he points out that the T-2 well was screened both above *and*

---

[9](...continued)
reports.  Versar initiated that process itself by submitting Perry's June 29, 2005 affidavit.  Since that time, it has submitted three additional expert affidavits, including April 2006 affidavits from both experts in which they elaborate for the first time on their theory that interconnected sand seams caused DNAPL to enter the T-2 well below the ZOI.  See Def. Response to Motion in Limine Exs. B & C.

below the designated ZOI (9 to 19 feet below ground surface), and he argues that therefore it is improper to assume that contamination entered from below the ZOI. He contends that, to a reasonable degree of scientific certainty, the DNAPL found at the bottom of T-2 entered from within the ZOI and sank to the bottom because DNAPL is dense relative to water.

Second, Dr. Sabadell disputes both defense experts' inference of contamination below the ZOI based on the PID readings, which he testifies are not scientifically acceptable data on which to base conclusions regarding the presence of contamination.  Sabadell testified that a PID instrument is used when drilling wells to screen for the presence of total ionizable chemicals, but that it is unreliable as a measure of quantitative concentration or to identify the location of contamination.  Pl. Motion in Limine Ex. A, ¶ 14 (Mar. 2, 2006 affidavit). Sabadell also claims that even if there were a direct hydraulic connection to explain the transport mechanism of contamination at the site, the lower PID contaminant concentrations collected from the sand and gravel water-bearing zone indicate that this connection was not the source of the more highly contaminated water measured in the till monitoring wells.  See Pl. Ex. 31 (Sept. 27, 2005 affidavit).

Finally, Sabadell disputes that the sand seams identified by Perry and Britton are interconnected and in direct contact with a contaminating source. Sabadell contends that if there were DNAPL in the sand seams and contaminant

migration into the sand and gravel layer or a vertically downward hydraulic gradient causing downward transmission of contamination, one would expect to see contamination in the monitoring wells located in the sand and gravel layer around the perimeter of the Enviro-Chem site.  Pl. Reply to Motion in Limine Ex. A, ¶ 14 (June 13, 2006 affidavit).  He claims that no significant contamination has been observed in these wells.  Sabadell also contends that Perry's theory about the continuous recharge of contamination from the underlying sand and gravel layer does not explain why no excess water was ever collected by the SVE system.

Sabadell's criticisms do not require exclusion of Perry's and Britton's testimony.  The criticisms do not completely undermine the reliability of their testimony, but point out weaknesses that are better addressed through the adversarial processes of trial.  For example, Dr. Sabadell criticizes the use of PID readings to infer contamination below the ZOI because he claims that such readings provide qualitative, as opposed to quantitative, measurements.  But Versar need only show that the SVE system failed by reason of presence of contamination below the ZOI, regardless of the precise levels of such contamination.  Dr. Sabadell's criticisms have not shown, at least as a matter of law, that PID readings are unreliable as an indicator of contamination.

Most important, Perry's and Britton's testimony, and Dr. Sabadell's criticisms of that testimony, must all be considered in light of how much is truly unknown about subsurface conditions in the northern area of the site.  It is

undisputed that very deep contamination was found in the southern area of the site. Neither side's experts can say conclusively at which depth contamination entered the T-2 well. All have applied their expertise and familiarity with hydrogeological conditions to formulate an opinion on this issue. In deciding a motion for summary judgment, the court may not simply choose one opinion over the other.

The Trustees also point to the horizontal well pilot test data recorded after the execution of Amendment No. 2, showing contamination at 9 to 11 feet below grade, well within the 13 to 15 feet ZOI defined in Amendment No. 2. See Ball Aff. ¶ 5 (Pl. Ex. 39). Sabadell testified that this evidence proves that only contamination at shallower depths caused the T-2A and T-3 wells to fail. This evidence is not conclusive, at least on summary judgment. Simply because there is evidence of contamination found within the contractual ZOI does not mean that an additional contaminated soil source below the ZOI did not prevent the SVE system from achieving required clean-up standards.

Although a court must exclude evidence when it concludes that "there is simply too great an analytical gap between the data and the opinion proffered," see *Target Market Publishing, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998), quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), the "question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to

-32-

determine after opposing counsel has been provided the opportunity to cross-examine the expert . . . ." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). Versar's experts have testified, based on the general character of subsurface conditions at the Enviro-Chem site and specific observations about contamination there, that contamination below the ZOI migrated to within the ZOI. That testimony is sufficiently reliable and relevant to be admitted.

In addition to this expert testimony, Versar points to documentary evidence that it argues demonstrates that the Trustees and EPA have acknowledged the migration of contamination throughout the northern portion of the site. For example, the June 1999 Trustees Report states: "The conditions of T-2 and T-6 [containing, respectively, a volume of free product and high vapor and dissolved levels of contamination] indicate the presence of sand lenses, *which may or may not be interconnected to some degree.* As a result, the SVE system will probably have to operate for a significantly longer period and SVE may or may not be sufficient to resolve these areas." Def. Ex. 22 at 4 (emphasis added). Versar also has submitted oversight review comments by EPA's contractor in October 2001, which state: "historically, we have not entirely agreed with the PRPs' interpretation of the subsurface conditions at the site. We agree that the subsurface is heterogeneous, but we believe that there may be more hydrogeologic connection between sand layers than Environ describes . . . . We think it reasonable that many of the zones of contamination are connected, rather than isolated as Environ has consistently described them. We have not made it a

barrier to progress because the topic would deteriorate into a simple technical argument that could not be proved." Def. Ex. 23 at 1.

All of this evidence is sufficient to present a genuine issue of fact as to whether the SVE system was unable to meet the subsurface till water criteria "by reason of" contamination below the ZOI. If Versar can show that the answer is yes, then its failure to meet the clean-up criteria could be excused by Section 2 of Amendment No. 2.

The Trustees also argue that Versar has not satisfied the conditions of Section 2 because it did not comply with Trustee Ball's instructions to "concentrate or augment" the SVE system before Versar was declared in breach. Section 2 requires that the Versar comply with the Trustees' reasonable instructions for addressing soil contamination below the ZOI or free product before it is excused from breach. Trustee Ball's instructions do not fall within the scope of this obligation, at least as a matter of law. Versar's entire argument is premised on the idea that no amount of "augmentation" of the SVE system would have enabled its system to remediate the site under actual existing conditions. Versar has come forward with evidence that might support that conclusion.

### 4. *Section Three of Amendment No. 2*

Just as no reasonable jury could conclude that Versar was entitled to be excused from breach based on the presence of free product at the site, no

reasonable jury could conclude that Versar's breach should be excused by the mere presence of a direct hydraulic connection.  The last sentence in Section 1 of Amendment No. 2 reads:  "Versar remains responsible, however, for dealing with all *water* (except as provided in Section 3. below) that the SVE system collects from the soil without any increase in Contract time or Contract price." (emphasis added).  Section 3 states in its entirety:  "In the event that there is a direct hydraulic connection between sand lens in the till and the underlying aquifer in the sand, Versar shall have no responsibility *therefore*." (emphasis added).

The Trustees argue that Section 3 operates in conjunction with Section 1 of the amendment to relieve Versar of responsibility for the water collected by the SVE system in the event that a hydraulic connection floods the system.  The Trustees contend that Section 3's conditions have not been triggered because Versar never encountered any flooding in the system.  They claim that the SVE system handled an average of slightly less than 20 gallons of water per day from August 1999 to February 2001 and that this amount is well below the Radian 100% Design criteria of 860 to 1,600 gallons per day.  See Scarpone Aff. ¶ 5; Pl. Ex. 3 at 2-21.

Versar contends that Section 3 excuses it from *all* responsibility under the Contract so long as a direct hydraulic connection is shown to exist at the site.  In the alternative, Versar argues that Amendment No. 2 is ambiguous and should be construed against the drafter, who it argues was Trustee Bernstein.  Because the

court finds that the provision is not ambiguous, the court does not consider Versar's alternative argument.

> Indiana's principles of contract construction teach that:
>
> The contract is to be read as a whole when trying to ascertain the intent of the parties.  The court will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless.  The court must accept an interpretation of the contract that harmonizes its provisions as opposed to one that causes the provisions to be conflicting.  If the language of the instrument is unambiguous, [the court] will determine the intent of the parties from the four corners of that instrument.

*Mid-States General & Mechanical Contracting Corp. v. Town of Goodland*, 811 N.E.2d 425, 431 (Ind. App. 2004) (internal citations omitted).  A contract is ambiguous only if it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning.  *Id.*

The Trustees' interpretation of these provisions is the only reasonable one, for several reasons.  First, Section 1 explicitly refers to Section 3.  Accordingly, the provisions should be read together rather than reading Section 3 as a stand-alone provision.  The placement of the Section 3 contingency within Section 1 further indicates that the subject of any release of responsibility is the "water" collected by the SVE system as a result of a direct hydraulic connection, and not the entire SVE project.  Versar's proposed construction would require the court to ignore both the reference and placement of Section 3 within Section 1, and therefore its construction is not favored.  See *Allied Structural Steel Co. v. State*, 265 N.E.2d 49,

52 (Ind. App. 1970) ("The true meaning of a contract is to be ascertained from a consideration of all its provisions, and a liberal or technical construction of an isolated clause should not be indulged to defeat the true meaning."), quoted in *MPACT Construction Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 908 (Ind. 2004).

Second, acceptance of Versar's interpretation would render the word "therefore" unnecessary, an outcome also to be avoided. *E.g.*, *Kiltz v. Kiltz*, 708 N.E.2d 600, 603 (Ind. App. 1999) ("In construing a contract, a court must accept a construction so as not to render words, phrases, or terms ineffective or meaningless."). Under the Trustees' interpretation, by contrast, "therefore" is used consistently with the word's meaning of "because of that." That is, Versar is relieved of responsibility for dealing with the water resulting from a direct hydraulic connection.[10]

Finally, the Trustees point out that Section 3 is written differently than Section 2, which operates to excuse Versar's failure to meet clean-up standards under certain conditions. Section 2 includes specific language that the Trustees will not hold Versar in breach of the Contract. Section 3 contains no such language.

---

[10]The Trustees have suggested that "therefore" is actually a mis-spelling of "therefor." The court agrees that this is most likely the intended term. Either way, the term has not been used in a way that would relieve Versar of all responsibility under the Contract.

As a matter of law, Sections 1 and 3 relieved Versar from liability for handling any water collected by the SVE system as a result of a direct hydraulic connection. Versar's failure to meet clean-up standards was not excused here by the mere existence of saturated soils or groundwater contamination in the northern area of the site. Versar has not presented any evidence, including the testimony of its experts, demonstrating that the SVE system ever handled water stemming from a direct hydraulic connection.

D.     *Versar's Defenses to Enforcement of the Contract*

Finally, Versar argues that the Contract should be avoided or reformed because it was premised on a mutually mistaken belief that contamination was present in only shallow depth soil (not groundwater) and could be remedied by the SVE system. In the alternative, Versar argues that it was unilaterally mistaken about the effectiveness of the SVE remedy and that the Trustees engaged in inequitable conduct to conceal their concerns about the system's effectiveness.

The court previously decided that Versar did not have a remedy in tort for its claim that the Trustees failed to disclose information relating to groundwater contamination at the site or the limits of the SVE system because it had not alleged any facts demonstrating a duty to disclose beyond what was required by the Contract. See Entry on Motions to Dismiss at 13, Docket No. 112 (JAMS). That entry did not foreclose a claim for breach of contract or an argument for avoidance of the contract altogether.

In March 2003, the court granted summary judgment in favor of the Trustees on all of Versar's counterclaims that predated Amendment No. 1 and Amendment No. 2, with the exception of a fraud claim based on affirmative misrepresentations (which Versar later dropped). The court found that Versar had released any and all claims that the Trustees withheld information regarding site conditions or that the SVE remedy could not achieve the Table 3-1 clean-up standards. The court noted, however, that "nothing in this entry precludes Versar from asserting the theories behind its counterclaims as affirmative defenses in response to the Trustees' claims." Entry on Motion for Partial Summary Judgment at 19, Docket No. 147 (JAMS); see also Order Denying Plaintiff's Motion for Reconsideration, Docket No. 160 (JAMS). Versar now advances those theories in requesting equitable relief from the Contract.

Under Indiana law, "equity has jurisdiction in only two well-defined situations: (1) where there is a mutual mistake; or (2) where there has been a mistake by one party, accompanied by fraud or inequitable conduct by the remaining party." *Mid-States*, 811 N.E.2d at 435 (contractor was not entitled to rescission of its project bid where there was no evidence of mutual mistake or inequitable conduct by accepting party), citing *Plumlee v. Monroe Guaranty Ins. Co.*, 655 N.E.2d 350, 356 (Ind. App. 1995). Versar argues under both theories, but it is not entitled to relief on either basis.[11]

---

[11]Versar also declared at one point that the Trustees' conduct was "unconscionable" but it did not develop this argument and therefore it is waived. See Br. at 18. Regardless, Versar could not meet the standard for demonstrating

(continued...)

1.    *Mutual Mistake*

In support of its argument for mutual mistake, Versar cites several cases that address contract reformation.  Those cases are not relevant here.  Where a party seeks reformation based on mutual mistake, it must demonstrate that there was a meeting of the minds but that the agreement in its written form does not express what the parties actually intended.  *Estate of Spry v. Greg & Ken, Inc.*, 749 N.E.2d 1269, 1275 (Ind. App. 2001).  A court may not intervene unless it is proven both that the parties were mistaken and that they agree on the terms to be substituted.  See *Plumlee*, 655 N.E.2d at 356, citing *Pearson v. Winfield*, 313 N.E.2d 95, 98-99 (Ind. App. 1974) (despite mutual mistake as to dimensions of land to be conveyed, contract could not be reformed where only one of three joint tenants intended to convey a portion of joint estate to third party).

Even if both parties were originally mistaken as to the extent of groundwater contamination at the site, the parties clearly do not agree now on Versar's obligations to remedy that contamination.  *E.g.*, *Plumlee*, 655 N.E.2d at 356 (party was not entitled to reformation of insurance policy for mutual mistake concerning

---

[11](...continued)
unconscionability under Indiana law.  As the court noted in its March 26, 2003 entry on the Trustees' motion for partial summary judgment:

> Versar's attempt to portray itself as the poor uncounseled victim of sharp lawyering by the Trustees does not raise a genuine issue of material fact. Beyond any reasonable dispute, the parties here were sophisticated businesses working with a custom-tailored multimillion dollar contract for sophisticated environmental remediation services.

Entry on Motion for Partial Summary Judgment at 12-13.

identity of insured vehicle where parties disagreed as to intended term).  "The primary purpose of reformation is to effectuate the common intentions of the parties to the instrument which were incorrectly reduced to writing.  To 'reform' a contract in favor of one party contrary to the intent of the other party amounts to little more than the court rewriting the contract which it clearly may not do."  *Id.* (internal citations omitted).

On the other hand, a party may *avoid* a contract under Indiana law based on a mutual mistake of fact because, in such circumstances, a meeting of the minds never occurred.  "Where both parties share a common assumption about a vital fact upon which they based their bargain, and that assumption is false, the transaction may be avoided if, because of the mistake, a quite different exchange of values occurs from the exchange of values contemplated by the parties."  *Jay County Rural Electric Membership Corp. v. Wabash Valley Power Association, Inc.*, 692 N.E.2d 905, 912 (Ind. App. 1998), quoting *Jackson v. Blanchard*, 601 N.E.2d 411, 416 (Ind. App. 1992); see also *Wilkin v. 1st Source Bank*, 548 N.E.2d 170, 172 (Ind. App. 1990).  The mistaken fact must be material or go to the essence of the agreement.  *Jackson*, 601 N.E.2d at 418 (affirming summary judgment in favor of former property owner where purchaser of restaurant alleged mutual mistake as to functionality of well, underground storage tanks, and septic system because those facts were not central to agreement).[12]

---

[12]Versar acknowledges that rescission of the Contract is not really an option here because both parties have already relied and acted on the contract and cannot be returned to the status quo.  Therefore, Versar requests instead that it
(continued...)

Versar contends that all parties were originally mistaken about conditions at the Enviro-Chem site and that both the Trustees and EPA have since acknowledged the inadequacy of the SVE system in remediating the site. Versar points to the following language from the June 1998 Trustees Report:

> Numerous studies have been conducted of this site over many years. They all showed that organics were present near the surface (primarily within the first four to five feet) and that the concentrations of organics declined to very low levels or to non-detect at about nine feet. The entire excavation and soil vapor extraction program is premised on the need to deal with concentrations of organics in soils within about nine feet of the surface. The remedy does not address water or impacted soils at significantly greater depth.

Def. Opp. Ex. 18 at 2-3. Versar also cites a January 17, 2001 memo from Trustee Bernstein to an EPA project manager, stating: "What we are saying is that the SVE system appears to have done a good job on the soil between the trenches (that's why the vapor data is good). However, the November data . . . confirms that we do appear to have an onsite till water problem in the areas of T-3 and T-2A that the SVE system after two years of operation has not improved." Def. Ex. 15.

As for EPA, Versar cites language in a report by CH2M Hill, EPA's contractor, discussing Fourth Quarter 1998 groundwater results at the site: "we have serious reservations that these (groundwater cleanup) criteria can be met. SVE is not an effective technology for groundwater remediation." Def. Ex. 14 at

---

[12](...continued)
be made whole under a theory of either unjust enrichment or implied contract. Since the court finds that Versar cannot succeed on its arguments of mutual or unilateral mistake, it need not decide the propriety of those remedies.

-42-

2.  Versar also has submitted an August 2001 letter from EPA's Remedial Project Manager to Trustee Ball in which EPA concludes that the SVE system has not been effective in addressing the "widespread" groundwater and surface water contamination at the site.  See Def. Ex. 18.  That letter urges the Trustees to proceed with the alternative remedy set forth in Section 3.3 of Revised Exhibit A.

Versar points to the Attachment Z-1 remedy itself as evidence that selection of the SVE system was premised on a misunderstanding about contamination at the site.  Versar claims that the revised remedy is quite different from the SVE system and that its implementation would require it to spend an additional $2.5 million for which it would not be paid.  Versar argues that the price term in its contract with the Trustees demonstrates that the parties could not have intended for it to be responsible for cleaning up the contamination under such circumstances.  See Art. 3.1 ("The Trustees shall pay Contractor $3,989,750 for the performance of all of the Work described in the Contract documents.").

The subsurface and hydrological characteristics of contamination at the Enviro-Chem site were clearly material to Versar's agreement to perform remediation services there.  Nevertheless, the plain language of the Contract allocates the risk of mistake about those conditions to Versar.

Under Article 7, Versar assumed the risk of unknown conditions at the site, subject to enumerated exclusions not applicable here (*e.g.*, errors in dimensions

in drawings or the presence of utilities, footings, or foundations at the site). Outside of those exclusions, Versar had "full responsibility with respect to physical conditions in or relating to the Site including, surface, subsurface and other existing conditions." Art. 7.2. The Contract also provided that if any physical condition uncovered or revealed at the site differed from that anticipated by Versar, Versar was to deal with the conditions as appropriate, consistent with the requirements of the EPA and the Trustees, without any adjustment in contract price or contract time. See Art. 7.4. Under Article 4.2 of the Contract, Versar was "solely responsible" for the means and methods of implementing the requirements of the Contract documents.

Any evidence demonstrating that the Trustees and EPA have expressed doubts about the SVE system does not change this result. Versar represented in the Contract that it had familiarized itself with the nature and extent of the Consent Decree including Revised Exhibit A, its Work, and the Site. Art. 4.1.1. Versar also represented that it would obtain and carefully study all technical reports and studies pertaining to subsurface or physical conditions at the Site or that otherwise might effect the performance and timing of its work. Art. 4.1.2. At the very least, Versar should have been aware of general concerns about SVE's effectiveness by the mere fact that EPA had required the Trustees to agree to a contingent remedy in the Consent Decree.

Moreover, it is undisputed that Versar was aware of specific concerns about groundwater contamination at least by the time it entered into Amendment No. 2 in December 1999. At that time, it recommitted to achieving compliance with all clean-up standards, subject to the three specific site contingencies discussed above.

The price term of Versar's contract does not nullify the Contract's allocation of risk to Versar. The cases cited by Versar in support of its argument recognize as much. See *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 615 (7th Cir. 1998) (executive's testimony about reason for decrease in price term during contract negotiations was not objective extrinsic evidence and therefore could not create an ambiguity as to meaning of contract); *Rhone-Poulenc Inc. v. International Ins. Co.*, 71 F.3d 1299, 1303 (7th Cir. 1995) (amount of consideration paid for contract, while providing a "good clue" as to contract's meaning, is "rarely usable to invalidate the contract"). Because environmental remediation is not a fungible product, the cost of implementing an SVE remedy is not readily susceptible to comparison with a baseline "normal" price for such work generally. *E.g.*, *PMC*, 151 F.3d at 615 ("it would be impossible as a practical matter to infer" the sale price of chemical plant that included disclaimer for environmental liabilities versus the sale price of "normal" plant).

Versar has tried to minimize its responsibilities under the Contract by pointing out that Radian's 100% design in June 1997 was negotiated and

approved by EPA before Versar even was retained by the Trustees.  Certainly, there might be an issue if *no* SVE system was capable of remediating the contamination shown to exist at the site.  The Contract specifically called for Versar to use that type of system.  But Versar has not argued for avoidance of the Contract on grounds of impossibility.  And one of the features of the Revised Remedial Action Plan was to "utilize a more flexible, performance-based SVE design for soliciting contractor bids to take advantage of contractor expertise, with a 'second look' review and approval of the selected contractor's completed SVE design" by EPA and IDEM.  The Contract explicitly called for participation by Versar in the system design.  See also Art. 2.12(1).

Versar assumed the risk of most unknown underground conditions.  It cannot show that its situation is one where "one party experienced an unexpected, unbargained-for gain while the other party experienced an unexpected, unbargained-for loss."  *Wilkin v. 1st Source Bank*, 548 N.E.2d 170, 172 (Ind. App. 1990).  As a matter of law, Versar is not entitled to avoid the Contract under a theory of mutual mistake.

2.    *Unilateral Mistake*

In the alternative, Versar claims that the Trustees were aware when they advocated the SVE remedy to EPA and when they entered into the Contract with Versar that the SVE system could not remediate contamination at the site.  Versar

argues that the Contract is unenforceable because the Trustees engaged in inequitable conduct to conceal this information from Versar.

In support of its argument, Versar claims that it was never informed that a 1988 pilot test of the SVE remedy was performed under abnormal conditions. The February 1993 Trustees Report noted that the SVE system had been tested during a period of relative drought in Indiana and that there had been a significant rise in the groundwater table at the Enviro-Chem site since that time. Def. Ex. 10 at 2-3. In the report, the Trustees stated that those circumstances "threatened the viability of our vapor extraction remedy." Versar also argues that the Trustees avoided testing groundwater at the site until after Versar had entered into the Contract and had begun operating the SVE system, despite EPA's wishes to gauge compliance earlier. Versar argues that, more recently, the Trustees have engaged in years of negotiations with EPA to prove that its revised remedy is merely an "augmentation" of the SVE system. Versar argues that the Trustees seek to shift the risk of this additional work to it through "evasive contract language."

"A contract generally may not be avoided for unilateral mistake unless the mistake was induced by the misrepresentation of the opposite party." *Mid-States General & Mechanical Contracting Corp. v. Town of Goodland*, 811 N.E.2d 425, 435 (Ind. App. 2004); see also *Hancock v. Kentucky Central Life Ins. Co.*, 527 N.E.2d 720, 724 (Ind. App. 1988) (discussing unilateral mistake as an alternative theory

for upholding trial court's decision to invalidate agreement).  Even assuming that Versar was mistaken as to the type and extent of contamination at the site, Versar has not presented any evidence that would allow a jury to find that the Trustees engaged in inequitable conduct to induce that mistake.

First, the results of the 1988 pilot test and concerns about a higher water table were noted in the AWD Phase I Investigation Report, supplemented in the AWD Phase II Investigation Report, addressed by EPA in the Revised Remedial Action (in discussing elimination of the SVE remedy for the southern concrete pad), and noted in the Radian 100% design – all documents that were referenced in Versar's Contract.  Again, Versar represented under the Contract that it had reviewed and familiarized itself with those documents.  See Art. 4.1.2.  "Equity should not intervene 'where the complaining party failed to read the instrument or, if he read it, failed to give heed to its plain terms.'"  *Mid-States*, 811 N.E.2d at 435, quoting *Estate of Spry v. Greg & Ken, Inc.*, 749 N.E.2d 1269, 1275 (Ind. App. 2001), quoting in turn *Gierhart v. Consolidated Rail Corp.-Conrail,* 656 N.E.2d 285, 287 (Ind. App. 1995); see also *United States v. Stump Home Specialties Mfg., Inc.*, 905 F.2d 1117, 1120 (7th Cir. 1990) ("Rights under a contract are not forfeited by the other party's failure to read it."); *Credit Alliance Corp. v. Campbell*, 845 F.2d 725, 728 (7th Cir. 1988) ("under Indiana law, as in most jurisdictions . . . '[a] person is presumed to understand the documents which he signs'"), quoting *Carney v. Central Nat'l Bank*, 450 N.E.2d 1034, 1038 (Ind. App. 1983).

Second, the Trustees have presented evidence indicating that the first monitoring well was installed and sample results were reported to Versar prior to execution of the Contract.  See Ball Dep. at 192-94, 600.  Versar has not cited any evidence disputing this point.

More generally, the Trustees' behavior in advocating a remedy before EPA is not relevant to the issue of the Trustees' behavior toward Versar.  Versar has not identified any specific misrepresentation made by the Trustees during the bidding process.  All of the evidence cited by Versar reflects only the Trustees' own similar coming to terms with the extent of contamination and the ultimate failure of the SVE system.  Versar is not entitled to relief from the Contract based on a theory of unilateral mistake resulting from inequitable conduct.

II.    *Trustees' Claim for Breach of Warranty*

Article 13.1 of the Contract provides an express warranty:

General Warranty – Contractor warrants to Trustees and Engineer that all Work will be in accordance with the Contract Documents.

The Contract defines "Work" as "the accomplishment of the items to be performed by the Contractor as set forth in the Contract Documents."  Art. 18.1.29.  As discussed above, Versar was responsible under the Contract for designing, constructing, installing, operating, and maintaining the SVE system to achieve full compliance with the clean-up standards listed in Revised Exhibit A.

The undisputed evidence shows that Versar is liable for breach of the express warranty.  Versar's failure to design, construct, and operate the SVE system to achieve full compliance with the Table 3-1 clean-up standards renders its Work "defective" under Art. 18.1.12.  Under the Contract, Versar is required to indemnify and hold harmless the Trustees from any damages caused by or resulting from defective work.  See Art. 15.2.  However, Amendment No. 2 would serve to excuse a failure to meet the clean-up standards if the conditions of its Section 2 are satisfied.  As explained above, that issue turns on disputed material facts that cannot be resolved on summary judgment.  Accordingly, the Trustees are not entitled to summary judgment in their favor on the breach of warranty.

III.    *Trustees' Claim for Breach of the Forum Selection Clause*

Article 10.1 of the Contract reads as follows:

> Since the purpose of this Contract is a continuing implementation of the consent decree over which the United States District Court for the Southern District of Indiana has continuing jurisdiction, all the disputes arising out of this Contract involve a federal question and shall be resolved in that Court.  The Trustees and the Contractor expressly consent to the jurisdiction of the Court.

The Trustees argue that Versar breached Article 10.1 by filing suit in federal district court in Pennsylvania in March 2001.  Versar contends that it did not breach the provision because its suit did not involve implementation of the Consent Decree or a federal question.  It claims that the suit was merely a dispute over monies owed pursuant to the Contract and that subject matter jurisdiction

was premised on diversity between the parties.   Versar points out that the Trustees have alleged only diversity jurisdiction in this action.

The Trustees have cited a decision from the Northern District of Illinois in which the court granted summary judgment on a breach of contract claim in favor of a party who had been forced to defend suit in New York despite the contract's forum selection clause designating Illinois as the site for litigation.  See *Laboratory Corp. of America, Inc. v. Upstate Testing Laboratory, Inc.*, 967 F. Supp. 295, 299 (N.D. Ill. 1997).  Applying Illinois law, the court held that the party had a right to enforce the forum selection clause *and* to recover damages for its breach.   In support of its decision, the court cited two Seventh Circuit decisions, *Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600, 604 (7th Cir. 1994), and *Northwestern National Ins. Co. v. Donovan*, 916 F.2d 372, 378 (7th Cir. 1990).

*Omron* involved a motion to dismiss a trademark infringement action where the parties' distribution agreement contained a provision stating that all disputes arising out of that agreement "shall be referred to the High Court of Justice in England which will have exclusive jurisdiction to determine such disputes." 28 F.3d at 601-02.   At the end of its decision affirming the district court's dismissal of the case, the Seventh Circuit stated:   "Omron signed a contract promising to litigate in the High Court of Justice, or not at all.   It broke that promise.  *Instead of seeking damages for breach of contract*, Maclaren is content with specific performance."  *Id.* at 604 (emphasis added).

In *Donovan*, the court considered whether the defendants had consented to being sued in the location specified in a contractual forum selection provision and thereby waived their objection to the jurisdiction of that forum's courts. The court concluded that they had, noting that the approach of its cases had been "to treat a forum selection clause basically like any other contractual provision and hence to enforce it unless it is subject to any of the sorts of infirmity, such as fraud and mistake, that justify a court's refusing to enforce a contract, or unless it does not mean what it seems to mean – unless, in other words, properly interpreted it is not a forum selection clause at all." 916 F.2d at 375; see also *IFC Credit Corp. v. Aliano Bros. General Contractors, Inc.*, 437 F.3d 606, 609-10 (7th Cir. 2006).

The court assumes that there is no legal obstacle to an award of damages for breach of a forum selection clause, at least where the clause is exclusive by its terms. It is eminently foreseeable that a breach of such a clause may require the expenditure of attorney fees and other costs to enforce it by securing the dismissal or transfer of a lawsuit or other proceeding.[13]

---

[13]It does not appear that Indiana courts have addressed this specific issue, but there is no apparent reason why breaches of these contract clauses would be exempt from damage awards. See *Allendale Mutual Ins. Co. v. Excess Ins. Co. Ltd.*, 992 F. Supp. 278, 286 (S.D.N.Y. 1998) (following bench trial, concluding that defendants had breached forum selection clause requiring that they submit to jurisdiction of United States for non-payment claims by initiating a declaratory judgment action in England; defendants were liable for expenses plaintiff had incurred in defending the English action); but *Wells v. Entre Computer Centers, Inc.*, 915 F.2d 1566, 1990 WL 146981, *3 n.3 (4th Cir. 1990) (*per curiam*) (unpublished) (affirming district court's dismissal of counterclaim for damages based on franchisees' breach of forum selection clause; appellant had not cited applicable authority), and *RGC International Investors, LDC v. ARI Network Services, Inc.*, 2004 WL 189784, *5 (D. Del. 2004) (plaintiff had obtained
(continued...)

The question here is whether the clause was breached.  Even assuming that damages are available for breach of a forum selection clause, Article 10.1 is not a typical forum selection clause.  As the Pennsylvania court recognized, the portion of the clause purporting to make all disputes arising out of the Contract fall within federal question jurisdiction is ineffectual.  Subject matter jurisdiction cannot be conferred by contract.  See Def. Ex. 27 at 5 n.10.  The Pennsylvania court held that this language did not invalidate the entire provision, but it does pose a problem in deciding the obligations imposed by the provision.  In the court's view, the parties' agreement that disputes arising out of the Contract "shall be resolved" by this court could not create a binding obligation to file suit in this court if the dispute did not actually fall within the court's federal question jurisdiction.  If Versar had attempted to file its claims here based on federal question jurisdiction, its suit likely would have been dismissed.

The additional language that the parties "expressly consent" to the jurisdiction of this court means only that they have waived any objection on that ground in defending an action here.  That portion of the provision does not itself make this court the exclusive venue for any action arising out of the Contract.  See *Muzumdar v. Wellness International Network, Ltd.*, 438 F.3d 759, 762 (7th Cir.

---

[13](...continued)
enforcement of its rights under forum selection clause granting exclusive jurisdiction to federal court in Delaware where Wisconsin court had declined to hear action brought by defendants and Delaware court had denied defendant's motion to dismiss or stay its proceeding; dismissing plaintiff's breach of contract claim as moot because plaintiff had not shown that it was also entitled to damages under Wisconsin law).

2006) ("where venue is specified with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified, the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive").

Also, the Pennsylvania district court's decision to transfer the case to this district under § 1404 does not control the issue of whether Versar should be liable for damages for filing suit there. A decision about the validity and application of a forum selection clause is separate from the § 1404 decision. Accord, *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988); *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1293 (7th Cir. 1989) ("a valid forum-selection clause may waive a party's right to assert his own inconvenience as a reason to transfer a case, but district courts still must consider whether the 'interest[s] of justice' or the 'convenience of . . . witnesses' require transferring a case").

Versar argued before the Pennsylvania court that Article 10.1 was not mandatory. See Def. Ex. 27 at 5 n.10. The court concluded that it did not need to decide that issue because § 1404 considerations favored transfer regardless of exclusivity. The court found that Article 10.1 was a valid and applicable forum selection clause and that Versar had not shown that the provision should not be enforced. See Def. Ex. 27 at 6. In reaching its conclusion, however, the court considered several factors external to the provision itself: it found that the parties'

preferences as to location counterbalanced one another, but that considerations of efficiency and Indiana's interest in deciding disputes involving the clean-up of environmental contamination within the state weighed in favor of transferring the case here.  See *id.* at 7-8.

The Trustees have not shown that Article 10.1 imposes on Versar an obligation to bring suit exclusively in this district, at least in an action arising out of the Contract that did *not* arise under federal law for purposes of subject matter jurisdiction under 28 U.S.C. § 1331.  Accordingly, Versar is entitled to summary judgment in its favor on this claim.

IV.    *Versar's Counterclaims*

Versar has brought counterclaims for breach of contract, implied contract, and unjust enrichment.  The Trustees stated in their opening brief that they sought summary judgment to dismiss "all three Counts of Versar's Third Amended Counterclaim," including the breach of contract claim, but they did not discuss this claim anywhere in their briefing.  Versar also has not discussed this claim. Versar's Third Amended Answer, however, indicates that Versar brought this claim, at least in part, to recover money allegedly owed by the Trustees as retainages and past due invoices.  To the extent that Versar seeks money damages allegedly owed under the Contract and its amendments, the Trustees have not shown why they are entitled to summary judgment in their favor on this count.

On the other hand, the Trustees have established that they are entitled to summary judgment on Versar's counterclaims for implied contract and unjust enrichment.  Under Indiana law, to recover under a theory of implied contract, a party must establish that another person impliedly or expressly requested the benefits conferred on him.  *Fowler v. Perry*, 830 N.E.2d 97, 104 n.2 (Ind. App. 2005), citing *Bright v. Kuehl*, 650 N.E.2d 311, 315 (Ind. App. 1995).  To prevail on a claim of unjust enrichment, a party must establish that it has conferred a measurable benefit on another under such circumstances that the other's retention of the benefit without payment would be unjust.  *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991).

In its Third Amended Answer, Versar alleges that it brought its implied contract and unjust enrichment counterclaims to obtain compensation for identifying various cost-saving measures and for providing technical advice to the Trustees outside the scope of the Contract.  In its briefing here, Versar appears to recognize that it could proceed under these theories only in a situation where the court avoided the Contract on grounds of mutual or unilateral mistake.  The court has already rejected those arguments.  Because there is an enforceable written contract governing the performance of Versar's remediation services, the Trustees are entitled to summary judgment on both claims.

As this court previously noted in its entry on the Trustees' motion to dismiss, unjust enrichment operates only where there is no governing contract.

See also *DiMizio v. Romo*, 756 N.E.2d 1018, 1025 (Ind. App. 2001) (trial court erred in invoking equitable theory of unjust enrichment where there was an enforceable contract).   Similarly, Versar has not offered any evidence demonstrating that the Trustees impliedly or expressly requested any benefits outside the scope of the Contract, at least not following Amendment No. 1.  In that amendment, Versar released the Trustees from any claims, "whether under the Contract or otherwise, including for all work done and labor and materials supplied at or in connection with the Site, including without limitation" for "all invoices unpaid in whole or in part issued by Contractor" and for "all change orders that are in whole or in part unapproved or unpaid prior to the date hereof." Sections 1 & 2.  The Amendment expressed an intent to settle all differences for "work done and materials and labor supplied . . . whether for work within or without the scope of the Contract."  Versar has not identified any work that it performed on behalf of the Trustees, outside the scope of the Contract, that would fall outside of the scope of this broad release.

### Conclusion

The Trustees' motion for partial summary judgment (Docket No. 4) is granted in part and denied in part.  The Trustees are entitled to summary judgment in their favor on their claim that Versar was obligated under the Contract and its amendments to achieve all Revised Exhibit A clean-up criteria, including the subsurface water criteria as measured in the on-site till wells.  The Trustees also are entitled to summary judgment in their favor on all arguments

related to the claim for breach of contract, except for excuse of Versar's performance because of contaminated soil below the contractual zone of influence. The same issue is the only basis for denying summary judgment to theTrustees on their claim for breach of warranty. The Trustees are also entitled to summary judgment against Versar on its counterclaims for implied contract and unjust enrichment. Versar's motion for partial summary judgment (Docket No. 247, JAMS) is granted only as against the Trustees' claim for breach of the Contract's forum selection clause. Versar's motion to strike the affidavit of Gabriel Sabadell (Docket No. 86) is denied. The Trustees' motion in limine to exclude the testimony of Perry and Britton (Docket No. 79) also is denied. The court will confer with counsel in the near future to schedule the case for trial on the remaining claims.

So ordered.

Date: September 5, 2006

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas A. Barnard
SOMMER BARNARD ATTORNEYS, PC
tbarnard@sommerbarnard.com

Norman B. Berger
VARGA BERGER LEDSKY HAYES & CASEY
nberger@vblhc.com

Dean R. Brackenridge
LOCKE REYNOLDS LLP
dbrackenridge@locke.com

Cory Stephen Brundage
cb@brundagelaw.com

Alan H. Goldstein
ICE MILLER LLP
goldstein@icemiller.com

Curtis W. McCauley
ICE MILLER LLP
mccauley@icemiller.com

Frederick D. Emhardt
PLEWS SHADLEY RACHER & BRAUN
emhardt@psrb.com

David A. Gradwohl
FOX ROTHSCHILD LLP
dgradwohl@foxrothschild.com

Philip L. Hinerman
FOX ROTHSCHILD LLP
phinerman@foxrothschild.com

Sharon Oras Morgan
FOX ROTHSCHILD LLP
smorgan@foxrothschild.com

George M. Plews
PLEWS SHADLEY RACHER & BRAUN
gplews@psrb.com